# Crawford *v.* Forest Oil Company, Appellant.

208      5
f213    ²599
e 30 SC ¹589

208      5
d216    ²422
208      5
34 SC ¹167

*Will—Devise—Life estate—Children.*

A devise to a son " and to his children " with a direction that the son shall pay certain legacies, vests a life estate in the son, and an estate in remainder in the son's children living at testator's death, subject to be opened to let in after-born children.

*Trespass—Oil—Action—Practice, C. P.—Life estate.*

Trespass is the proper remedy for the recovery of damages for oil taken from land.

A tenant under an oil lease executed by one having an estate for life, who continues to take oil after the death of the life tenant may be sued in trespass by the remainderman. In such a case the measure of damages is the difference between what oil sells for in the market and the cost of production.

Argued Nov. 9, 1903. Appeal, No. 171, Oct. T., 1903, by defendant, from judgment of C. P. Washington Co., Nov. T., 1900, No. 113, for plaintiff on case tried by the court without a jury in suit of Thomas L. Crawford et al. v. Forest Oil Company. Before MITCHELL, C. J., DEAN, FELL, BROWN, MESTREZAT and POTTER, JJ. Affirmed.

Trespass for the alleged illegal taking of oil.

The case was tried by the court without a jury under the Act of April 22, 1874, P. L. 109.

MCILVAINE, P. J., filed the following opinion :

From the pleadings and testimony taken, the court finds the

facts in this case to be as hereinafter set out under the two heads "Principal Facts Found," and "Collateral Facts Found."

## I. PRINCIPAL FACTS FOUND.

1. William Crawford died in the year 1846, leaving a will which was duly probated on August 25, 1846, and remains of record in the register of wills office of this county. At the time of his death he was the owner in fee of a tract of land in Mt. Pleasant township, this county, containing 105 acres more or less, which he called his "old farm adjoining Mark Kelso and others," and in this will thus probated he provided, inter alia, as follows: "I will and devise to my son Matthew and to his children my old farm adjoining Mark Kelso and others, provided however at the end of one year after my decease or when called upon for it, he shall pay to his mother the sum of three hundred dollars in addition to the sum as above bequeathed her; and he shall pay also to my son Oliver's child when it shall become of age, the sum of two hundred dollars but if the child shall die before it comes of age I will that he be altogether exonerated from the payment of the said two hundred dollars." This farm is the one concerning which the controversy in this case arises.

2. Matthew Crawford, the devisee named in the part of William Crawford's will just quoted, immediately after his father's death in 1846 took possession of this farm thus devised to him and was in possession of the same at the time of his death, which was on September 30, 1894. He never had any title to this land other than that evidenced by his father's will.

3. The plaintiffs in this case are the living children of Matthew Crawford and those who stand as the legal representatives of those who are dead, and they claim title to the farm concerning which this controversy arises under the same clause of the will of William Crawford that vested title in their father, Matthew Crawford, and as against the defendant company in this action they have no title to said farm other than is evidenced by the will of William Crawford.

4. At the time of the death of Matthew Crawford, on September 30, 1894, there were on this farm—title to which is claimed by the plaintiffs under the will of William Crawford —four producing oil wells which, between the time of his

death and the bringing of this suit, have produced large quantities of oil which the defendant company took and carried away.

5. Immediately after the death of Matthew Crawford, on September 30, 1894, George Crawford, one of his children and one of the plaintiffs in this case, in his own behalf and for and in behalf of the other plaintiffs who with him claimed as tenants in common entered upon, and as against the defendant company held actual and full possession of the land devised to them by William Crawford up to November 27, 1894, and they were in actual possession on October 13, 1900, when this suit was brought.

6. On November 27, 1894, nearly two months after the plaintiffs had come into actual possession of this farm, the Forest Oil Company, the defendant in this case, as an intruder wrongfully entered thereon and wrongfully took possession of the four producing oil wells drilled thereon before the death of Matthew Crawford and so much of the surface thereof as was necessary to operate the same, and continued in possession thereof until July 30, 1897, during which period it wrongfully pumped therefrom, carried away and had stored in pipe lines off the premises large quantities of oil which was afterwards sold and the price thereof received and wrongfully appropriated by it.

8. The fair market value, in the pipe lines, of the oil wrongfully taken and carried away by the defendant company between November 27, 1894, when it first took possession of these wells, and July 30, 1897, when it surrendered possession to the receiver, is $36,611.44; and the fair and reasonable charges for producing said oil from the wells and putting it into the pipe lines, including labor and repairs to machinery and appliances is $4,526.84.

9. The delay on the part of the defendant company in not compensating the plaintiffs for the damage done them is not excusable, and the damage suffered by the plaintiffs for this delay in payment or the detention of the oil, is assessed at $12,000, which is slightly less than six per centum interest on the money received by the defendant company after deducting the expenses of operating and keeping the wells in repair from the times it received it until this date.

### COLLATERAL FACTS FOUND.

1. On December 4, 1890, Matthew Crawford granted to T. J. Vandegrift, his heirs and assigns, the exclusive right of operating for oil and gas on this farm of 105 acres, more or less, and on May 11, 1891, T. J. Vandegrift assigned all his right, title and interest under this grant and other leases that he held, to the Woodland Oil Company, its successors or assigns, and on November 27, 1894, the Woodland Oil Company assigned its interest under said grant, together with other leases, to the Forest Oil Company, the defendant company in this case. And it was under this assignment that the defendant company entered upon the plaintiffs' farm on November 27, 1894, or a few days thereafter, and took possession of the four producing oil wells found thereon and which had been drilled by the Woodland Oil Company during the life of Matthew Crawford.

2. At the time Matthew Crawford made his lease to T. J. Vandegrift, George and Thomas Crawford, two of the plaintiffs, had knowledge that it was being made, afterwards, that wells were being drilled and oil produced and royalties paid to their father, but they also knew that Matthew Crawford did not claim to have anything more than a life estate in the land in question and that he so informed the person who took the lease, and that that was always the understanding between him and his children and in the neighborhood.

3. The Forest Oil Company, the defendant in this case, when it took its assignment from the Woodland Oil Company and before it paid in full the consideration money for that assignment, had reasons for knowing that the plaintiffs did not recognize the lease of Matthew Crawford as binding on them after his death, and did know that the will of William Crawford was the only evidence of title to the 105 acres that Matthew Crawford had when he made his lease to T. J. Vandegrift. They entered and took the oil under the claim, and still maintain that the will of Wm. Crawford gave to Matthew Crawford a fee simple estate in the 105 acres of land devised to him. The company was never misled by the plaintiffs as to what Matthew Crawford's title was and did not buy his lease to T. J. Vandegrift for reasons other than that it believed the will of Wm. Crawford gave to Matthew Crawford a fee simple estate.

4. When Matthew Crawford executed his lease to T. J.

Vandegrift on December 4, 1890, he owned in fee thirty-three acres adjoining and lying east of the tract devised to him by his father, Wm. Crawford. The lease embraced both tracts (138 acres more or less). In the lease is found this provision: "The product of the eastern thirty-three acres to be kept separate."

5. On November 30, 1894, the defendant company paid to the Woodland Oil Company the sum of $14,000 and took from it the following receipt: "Received of the Forest Oil Company, Fourteen Thousand Dollars on account of a sale to them on the 27th day of November, 1894, of the Matthew Crawford, James G. Berry, Scott Heirs, Thompson Cowden and a portion of the Stilley farms, situate in Mt. Pleasant Township, Washington County, Pa., South of Primrose, upon which there are ten producing wells, rigs, tanks, machinery, casings, pipes and fixtures thereto belonging and on the different leases. The purchase price $52,000 of which this is on account and the remainder to be paid as soon as titles are perfected. In event of our not being able to make a sufficient title to the Matthew Crawford, the Matthew Crawford and Stilley leases are not to be included in the sale and a proper reduction to be made from the original amount to be settled by T. J. Vandegrift on the part of the Woodland Oil Company and W. J. Young for the Forest."

6. Oliver P. Crawford, one of the children of Matthew Crawford, a nonresident of this state, brought an action of ejectment in 1896 in the United States circuit court of the western district of Pennsylvania to recover his undivided interest in this farm. Judgment was entered in his favor and this judgment, upon appeal to the United States circuit court of appeals, was affirmed and by a writ of habere facias possessionem he was put in possession in the early part of 1897. The Forest Oil Company then brought an action of ejectment against him to recover back possession of this interest, judgment was entered against it and on appeal the judgment was affirmed in the fall of 1897. Eliza Erskine, Mary H. Davis, Nancy Reed, Matthew A. Crawford and William Crawford, other children of Matthew Crawford, respectively brought suits for his or her interest in this land and each recovered judgment in an action of ejectment in the United States circuit court for the western

district of Pennsylvania, and these several judgments on appeal were affirmed.

After these judgments had been affirmed, a bill in equity was filed in the circuit court of the United States for the western district of Pennsylvania, in which the children of Matthew Crawford were made plaintiffs and the Forest Oil Company defendant, under which a receiver was appointed and a decree made against the defendant company to account to the plaintiffs for the oil taken by it, and a master appointed whose report against the defendant company was approved and judgment entered against it for several thousand dollars. On appeal by it, the United States circuit court of appeals reversed this judgment of the court below and directed that the plaintiffs' bill be dismissed for the reason, among others, that the plaintiffs had an adequate remedy at law. This judgment of reversal was entered May 21, 1900, and on October 13, 1900, the suit at bar was instituted.

7. During the time the defendant company took the oil in controversy, the usual royalty paid to a landowner in Mt. Pleasant township, Washington county, by a lessee who assumed the risk of getting oil and paid all expenses of drilling and operation, was one eighth of the oil in the pipe lines. There was no evidence offered by either party as to what the royalty would be where the landowner leased producing wells.

CONCLUSIONS OF LAW.

1. That Matthew Crawford had only a life estate in the 105 acres, more or less, which was devised to him by his father, Wm. Crawford, and which he leased to T. J. Vandegrift for oil and gas purposes.

2. That the plaintiffs may be estopped from calling in question the validity of the lease made by Matthew Crawford, the life tenant, to T. J. Vandegrift during Matthew Crawford's life, but that they are not estopped from claiming that the lease terminated at his death and that all rights of the Woodland Oil Company to the oil in and under the farm in question terminated at that time, and that the defendant company took nothing under its assignment from the Woodland Oil Company and was a trespasser when it entered under that assignment.

3. That the true measure of damages in this case is the value of the oil taken in the pipe lines less the expense of putting it there, which expense would include labor and necessary improvements and repairs to the fixtures and appliances used in doing this, with such additional sum as would compensate the plaintiffs for the detention of the oil or for the delay in not receiving the damages that they were entitled to receive,—this sum not to exceed legal interest on the various sums received by the defendant company for the oil which it wrongfully took and sold.

4. That the plaintiffs are not in this action entitled to recover damages for oil drained through wells on adjoining farms nor for the defendant's neglect in not drilling more wells on the 105-acre tract of land nor for preventing them from drilling other wells thereon.

5. That the plaintiffs in this case are entitled to a judgment against the defendant company for the sum of $44,084.60.

COMMENTS.

1. AS TO FACTS FOUND.

In our findings of facts, we have classified them under two heads,—1. Principal facts ; 2. Collateral facts.    The principal or controlling facts are the facts upon which we rest our decision in favor of the plaintiffs.    The collateral facts are facts that are not necessary to support the plaintiffs' case, but may be important in the event that we are wrong in our views of the law, and they are found for use in the appellate court if an appeal is taken from the judgment entered by this court.

2. AS TO CONCLUSIONS OF LAW.

(*a*) Rulings against plaintiffs.

The plaintiffs at the trial offered to show that they were damaged because the defendant company during the time it was in possession of their land "took and carried away large quantities of oil underlying it through wells on adjoining lands which it was then operating," or so operated their land as "to permit and suffer the oil therein to be drained out by wells drilled upon adjoining property."    This was objected to as incompetent and irrelevant under the pleadings in this case.    We

sustained the objection and overruled the offer.  After consideration we are still of the opinion,—1. That in this action the plaintiffs cannot recover damages against the defendant company for draining oil that belonged to them in situ through wells that it lawfully drilled on adjoining farms.  2. That in this action they cannot recover damages against the defendant company for oil they did not take out through wells drilled on the plaintiffs' land nor for not drilling more wells so that they could have taken out more oil.  3. That they cannot recover damages in this action against the defendant company for the reason that if the plaintiffs had been in full possession they might, have drilled one or more additional wells on their land and obtained more oil than was obtained.

The plaintiffs also claimed that the trespass committed by the defendant company was such that it was not entitled to any credit for expenses and improvements put upon the lease. In our opinion the defendant was not guilty of a malicious trespass.  It acted under a mistaken belief on a question of law.  It must bear the consequences of that mistake, but the plaintiffs ought not to have more than they would have gotten had they entered and operated the wells themselves.  We have not treated the material taken off the farm and set out in plaintiffs' statement as a separate claim or as something separate from the taking of the oil, but have taken what was done in the way of adding material and appliance and of taking away material and appliance as having been done in the operation of the wells, and the balance in favor of the defendant company we have found to be $4,526.84 or the difference between $7,708.44, defendant's account for expenses for operating and improvements and repairs and $3,181.60, value of material and machinery removed from the wells.

(b) Rulings against the defendant.

1. What estate did Matthew Crawford take under the will of William Crawford to the land in controversy?

A life estate.  Why?  It was devised to him "and his children."  "Children" is a word of purchase and not limitation. It does not limit or qualify the estate devised but describes the persons who take.  Fully expressed, the will would read "to Matthew Crawford and to his children then in being, to wit, George Crawford, Thomas L. Crawford, etc., and any other

children that may hereafter be born to him in lawful wedlock. The children to take at his death." This rule of interpretation is well established. There is nothing in the will of William Crawford showing clearly that he used the word in any other than its technical sense, and in the absence of such a clear intent of the testator gathered from the language of the will itself, we cannot say that he used the word children as a word of limitation. The exact question here raised has been decided by the United States circuit court of appeals, Forest Oil Company v. Crawford, 77 Fed. Repr. 106, and 83 Fed. Repr. 109, and the decision of that court is certainly highly persuasive if not a binding authority, and with the general rule just given and these decisions before us we could not do otherwise than hold that Matthew Crawford took only a life estate in the land in controversy under his father's will, and that his children took an estate in remainder.

. 2. Are the plaintiffs estopped from denying that William Crawford had a fee simple estate in this land ? Not unless they did something to deceive the defendant company, upon which it acted to its injury. The evidence shows that two of the plaintiffs after the death of Matthew Crawford told the defendant company's agent that they would not give the company any trouble, but this was coupled with the information that others of the children would and the advice that Mrs. Erskine of Steubenville should be seen. Clearly there is nothing here that would estop the plaintiffs from standing on their legal rights. But it is claimed that George Crawford and Thomas L. Crawford, and perhaps others of the plaintiffs, acquiesced in the father's making of the lease to T. J. Vandegrift and had knowledge of the Woodland Oil Company drilling under that lease and of its paying royalties to their father for the oil taken; and this is all true, as we have set out in our findings of fact. But can these facts be set up as constituting an estoppel by the defendant company? It may be conceded that they would estop the plaintiffs from claiming damages from the Woodland Oil Company for taking oil during the life of Matthew Crawford, but from such a concession it would not follow that the same contention could be sustained as to the Forest Oil Company that entered upon this land two months after the plaintiffs had entered upon their in-

heritance and the lease of Matthew Crawford to T. J. Vande-
grift had been ended by the death of Matthew Crawford. Oil
is a mineral in situ and like coal can be taken by the life ten-
ant if at the time his testator dies there are on the land open
mines. If there are no open mines and he opens them, he is
liable to the remaindermen for the oil or coal taken in an ac-
tion of waste. Matthew Crawford, a life tenant, through the
Woodland Oil Company, the assignee of his lessee, drilled
wells and took oil. The remaindermen as against both had a
right of action, but if they encouraged the opening of the
mines, they would be estopped from bringing such action.
But this certainly would not be the case for oil taken after the
death of the life tenant. The lease terminated at his death.
The testimony shows that when the lease was made and when
it was being operated by the Woodland Oil Company, the
plaintiffs consented to their father as a life tenant taking the
oil. And if the father had lived long enough, all the oil might
have been taken. The lessee when he took the lease was ex-
pressly told that Matthew Crawford had only a life estate, and
the source of his title was known to the lessee or ought to
have been known as it was on record in the register of wills
office for his inspection and examination. Certainly there was
nothing done by any of the plaintiffs that was not wholly con-
sistent with the theory that they were allowing the life tenant
to take or mine the oil the same as though wells had been
drilled or mines opened before the death of his testator and
that his right or those claiming under him so to do would ter-
minate with the death of the life tenant. When the Forest
Oil Company entered, it knew the source of the title of Mat-
thew Crawford, it examined his father's will for the express
purpose of seeing what his estate in the land was, in the eyes
of the law it knew or ought to have known that he had only a
life estate, it knew that the plaintiffs had not signed the lease
to T. J. Vandegrift, and it had good reasons for knowing that
the plaintiffs or at least some of them would likely make
trouble if their claim that their father was only a life tenant
should be controverted. Knowing these things, it is evident
that it was not induced to buy an assignment of the Wood-
land Oil Company by any representations or conduct of the
plaintiffs, but because, after an examination of the will of

William Crawford, it believed that Matthew Crawford took a fee simple estate in the farm devised to him. If the interpretation it put upon this will was a mistake in law, it cannot now charge that mistake up to the plaintiffs by saying that they are estopped from claiming their rights under their grandfather's will.

3. Have the plaintiffs a right to maintain this action of trespass?

Before the civil procedure act of 1887, the wrongful taking of oil by one person from the land of another and appropriating the same to his use,—according as the facts might be made to appear,—would support either an action of trover, an action of trespass de bonis asportatis, an action of trespass quare clausem fregit or an action of trespass for mesne profits. All of these actions under the act of 1887 are now " actions of trespass." The wrongful taking of oil in the pipe lines, if nothing more appeared in the case, would be the wrongful taking of personal property and either of the first two actions named would be a proper remedy; but if this oil, before it reached the pipe lines, had been severed by the wrongdoer from the land where nature stored it, then the wrongful taking of it would be a wrong that would involve the question of the possession of the land out of which the oil was taken, or of the oil in situ which is in a sense real estate. In the case at bar the defendant company severed the oil from the land, therefore we take it that the plaintiffs' statement and the proof thereunder to sustain the action at bar ought to be sufficient to support either an action of trespass quare clausem fregit, or an action of trespass for mesne profits. To sustain either of these actions, title and actual possession or the right to immediate possession are involved. If the defendant is in possession and is a wrongdoer without claim of title, title and the right to immediate possession in the plaintiffs are sufficient to maintain an action of trespass quare clausem fregit. If the defendant is in adverse possession under color of title, the plaintiff must first establish his title in an action of ejectment. If he succeeds and regains possession, then he is in position to maintain and prosecute to judgment an action of trespass for mesne profits. Under the Act of 1879, P. L. 125, this action of trespass may be instituted before possession is regained but cannot be prosecuted to judg-

ment until the question of title in the ejectment suit is fully settled. As we have found in this case, the plaintiffs entered upon the farm in controversy at the death of their father. This entry was not by all of them in person it is true, but as they were tenants in common, that was not necessary. Those that did actually enter made an entry for all which the law recognizes as putting them all in possession. Two months after this date, the defendant company entered upon the same farm and took possession of the four wells that had previously been drilled and enough of the surface of the land to operate these wells, and carried away large quantities of oil without any title to either the land or the oil and without any such claim of adverse possession under color of title as would prevent the plaintiffs from maintaining an action of trespass before first bringing action of ejectment and recovering back the oil wells and the surface necessary to operate them. The defendant company did not deny the title of the plaintiffs to the farm in question; its claim was that they did own the farm but as heirs of Matthew Crawford and that it held a lease thereof " for three years from December 4, 1890, and as much longer as oil and gas is found in paying quantities thereon, yielding and paying to the lessor the one-eighth part of all the oil produced and saved from the premises delivered free of expense into tanks or pipe lines," which was made by their predecessor in title and bound him and " his heirs." The plaintiffs claimed that Matthew Crawford being only a life tenant could not make a lease binding them,—that their title was not derived from him but from William Crawford from whom he himself derived his title, and that the paper title of the defendant company, to wit: the will of Wm. Crawford and the lease of Matthew Crawford, did not in the eyes of the law give to it even color of title but on their face showed that the defendant had no right of entry on November 27, 1894, when it did enter. To repeat, we hold first that George Crawford entered on the farm in controversy on September 30, 1894, that he entered for all the plaintiffs who were tenants in common with him and that he was in possession when the defendant did the initiative act of trespass complained of in this action; second, that as against the defendant company which was without title and out of possession, the original entry of the plaintiffs upon the sur-

face was an entry as to the oil contained in the land and under the surface; third, that the possession of the defendant company after November 27, 1894, was that of a presumptive wrongdoer and was not such adverse possession under color of title as to prevent the plaintiffs from maintaining an action of trespass for the oil wrongfully mined and carried away until they had established their title and regained possession of the four oil wells in actions of ejectment. If, however, we are mistaken in these conclusions, it does not follow that the plaintiffs cannot maintain this action of trespass. On July 30, 1897, the possession of these four oil wells was taken away from the defendant company and there is no evidence that it ever retook possession after that date or that it was in adverse possession under color of title on October 13, 1900, nor is there even any evidence that these oil wells on October 13, 1900, were producing oil "in paying quantities," or in other words, that the lease under which the defendant claimed had not expired by its own terms. If the defendant company before October 13, 1900, had exhausted all the oil, then on its own showing it at that date had no title or color of title, and if it never went into actual possession after the receivership terminated, there could be no right of action in ejectment in the plaintiffs against the defendant company on October 13, 1900, and they would be free to bring their action of trespass for mesne profits or damages for taking and detaining the oil. All that the Act of 1879, P. L. 125, authorizing actions for mesne profits, requires, is that the plaintiffs shall have obtained possession before the trial of such action. There certainly was no claim at the trial that the defendant company was still in possession of these oil wells producing oil. And of course we could not say that a writ of habere facias possessionem was under such circumstances indispensable. "If possession is voluntarily given up, the right to institute an action for mesne profits is as clear as if it had been forcibly taken under a writ:" Caldwell v. Walters, 22 Pa. 378.

4. What is the true measure of damages in this case?

The evidence shows that the defendant company took the oil under a claim of right which turned wholly on a question of law. In law it had no claim, but it thought the law gave it a claim. It was honestly mistaken when it made the entry,

and therefore we are of opinion, as we have already indicated, that the net value of the oil in the pipe lines is the true measure of damages for the oil taken, and in arriving at that sum we have taken what the oil sold for in the market and from this deducted the cost of production.   The claim that the value of one eighth of the oil was the true measure of damages is clearly untenable.   That was the usual royalty paid to a landowner, at that time and in that locality, by a lessee who drilled the wells.   Here the landowner had four wells already drilled and that were producing oil.   And the net value of the daily production would be the profit accruing to the owner of the land.   The defendant company drilled no wells and it had no property rights in the wells it operated.   It was a trespasser, and if it is allowed its expenses in producing the oil, together with the difference in value of the improvements, etc., it put on and the machinery, etc., it took away from the wells, what more could it ask?   To say it is entitled to seven eighths of the oil is to say indirectly that it had a good title under its assignment to the oil that it took, and the plaintiffs would be getting no more than if they had acknowledged that the company's possession was lawful.

The damages for the detention we have fixed at $12,000, a sum inside six per cent interest on the net amount received by the defendant company for the oil wrongfully taken by it.

And now, January 20, 1903, it is ordered that this decision be filed and that the prothonotary give the notice required by the act of assembly, and if no exceptions are filed that judgment be entered in favor of the plaintiffs and against the defendant for $44,084.60 and costs as provided by said act.

*Error assigned* was the judgment of the court.

*J. McF. Carpenter*, for appellant.

*J. H. Beal*, of *Reed, Smith, Shaw & Beal*, with him *John H. Murdoch*, for appellees.

OPINION BY MR. JUSTICE BROWN, January 4, 1904:

The primary question involved in this controversy is as to

the estate which passed to Matthew Crawford under the will of his father, William Crawford. If the devise was only of a life estate, the lease executed by Matthew, the father and grandfather of the appellees, was limited to his life, and the remaindermen are not bound by it.

The language of the devise is : " And I will and devise to my son Matthew and to his children, my old farm adjoining Mark Kelso and others, provided however, at the end of one year after my decease, or when called upon for it, he shall pay to his mother the sum of three hundred dollars, in addition to the sum as above bequeathed her; and he shall pay also to my son' Oliver's child when it shall become of age, the sum of two hundred dollars, but if the said child shall die before it shall become of age, I will that he be altogether exonerated from the payment of the said two hundred dollars." The will was executed in 1843. At that time Matthew had seven children living. Subsequently six more were born—five before and one after the death of the testator.

The word " children " is a word of purchase, and not of limitation, and describes the persons who take. In very many, of our cases, it is true, the word has been used as one of limitation ; " but in all of them such construction was clearly in accord with the intent of the testators as gathered from the four corners of the will, as when ' children ' has been used with ' heirs of the body ' or ' issue ' as its synonyms :" Oyster v. Oyster, 100 Pa. 538. The rule, as laid down by Lord HARDWICKE in Bussar v. Brandford, 2 Atk. 220, is, that " children, in their natural import, are words of purchase, and not of limitation, unless it is to comply with the intention of a testator, where the words cannot take effect in any other way." There is nothing in any other portion of the will of William Crawford clearly indicating his intention to use the word in any other than its technical sense. If the children of Matthew took directly from their grandfather, what was the estate given to their father and what passed to them ? In England and this country there are numerous authorities bearing upon the question which might be collated and commented upon, if we could longer regard it as an open one with us. That was done in Coursey v. Davis, 46 Pa. 25, and it was held that a conveyance to a married woman, " and her children

exclusively, and their heirs and assigns, to have and to hold" to her "and to her children exclusively and their heirs and assigns," vests in her a life estate, with remainder in fee to her children as a class, so that those in being at the date of the deed, as well as those subsequently born, would be entitled to take in the distribution on the termination of the life estate at her death. Mr. Justice READ, in delivering the opinion of the court, followed Jeffery v. Honywood, 4 Madd. Ch. Rep. 211. Though doubt has been thrown upon it as authority, it was there held by the vice chancellor that a devise to the testator's daughter, a married woman, "and to all and every the child and children, whether male or female, of her body lawfully begotten, and unto his, her, and their heirs or assigns forever, as tenants in common, and not as joint tenants," gave a life estate to the mother and a remainder in fee to the children. In the comparatively late case of Hague v. Hague, 161 Pa. 643, where the testator directed his executors to deliver to his daughter, Sarah Jane Hague, a deed which he had executed to her, we held that the conveyance to " Sarah Jane Hague and her children " gave to the mother but a life estate, with remainder in fee to her children as a class, and that those born after the death of the testator participated equally with those born before. In construing this devise the circuit court of the United States for the western district of Pennsylvania held that " Matthew Crawford took a life estate in the land in question ; that his children living at the testator's death took an estate in remainder, which, under the authority of Hague v. Hague, 161 Pa. 643 (29 Atl. Repr. 261), and Gernet v. Lynn, 31 Pa. 94, opened to let in after-born children." On appeal from this to the circuit court of appeals for the third circuit, it was affirmed and reaffirmed, DALLAS, J., saying : " The court below, construing this clause with due reference to the entire will, held that, by virtue thereof, Matthew Crawford took a life estate, and that his children living at the testator's death took an estate in remainder, which opened to let in after-born children. The sole question before this court is as to the correctness of this interpretation, and upon that question we have no doubt whatever. The learned judge was right in accepting the decisions of the Pennsylvania Supreme Court as controlling. They are sufficiently referred to in his opinion ; his understanding of

them accords with our own, and his application of them to the matter in hand is entirely satisfactory. Therefore, the judgment is affirmed:" Forest Oil Company v. Crawford, 77 Fed. Repr. 106, and 83 Fed. Repr. 109. ⁃The learned judge of the common pleas justly regarded this as high authority.

The direction that Matthew Crawford pay two legacies was insufficient to enlarge his life estate to a fee : Gernet v. Lynn, 31 Pa. 94 ; Hinkle's Appeal, 116 Pa. 490.

The foregoing question and all of the others raised on this appeal were correctly and so carefully and intelligently disposed of by the learned trial judge that nothing can be profitably added to his disposition of the case. The judgment might well be affirmed on his findings and conclusions, and it now is practically so affirmed.