J-A04023-14

2014 PA Super 237

| | | |
|---|---|---|
| DENNIS SABELLA | ⋮ | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | ⋮ | |
| v. | ⋮ | |
| APPALACHIAN DEVELOPMENT CORPORATION AKA APPALACHIAN DEVELOPMENT CORP; AND BRIAN C. HANER AND LISA M. HANER, D/B/A PINE RIDGE ENERGY | ⋮ | |
| Appellants | ⋮ | No. 722 WDA 2013 |

Appeal from the Judgment Entered on April 8, 2013
In the Court of Common Pleas of Warren County
Civil Division at No.: 2010-150

| | | |
|---|---|---|
| DENNIS SABELLA | ⋮ | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Cross-Appellant | ⋮ | |
| v. | ⋮ | |
| APPALACHIAN DEVELOPMENT CORPORATION AKA APPALACHIAN DEVELOPMENT CORP; AND BRIAN C. HANER AND LISA M. HANER, D/B/A PINE RIDGE ENERGY | ⋮ | |
| Cross-Appellees | ⋮ | No. 766 WDA 2013 |

Appeal from the Judgment Entered on April 8, 2013
In the Court of Common Pleas of Warren County
Civil Division at No.: 2010-150

BEFORE:  BOWES, J., WECHT, J., and STABILE, J.

OPINION BY WECHT, J.:                                  **FILED OCTOBER 20, 2014**

In this oil and gas case, Dennis Sabella and the above-captioned Appellants/Cross-Appellees (hereinafter, the "Haners," except where context requires reference to Brian Haner individually) file cross-appeals challenging generally the judgment that the trial court entered in Sabella's favor. Each party challenges aspects of that learned court's entry of partial summary judgment, as well as that court's verdict entered after a bench trial addressing the issues not disposed of on summary judgment.

Following careful review, we affirm in part, but we vacate aspects of the trial court's judgment and remand for further proceedings.

## BACKGROUND

The trial court has provided us a thorough summary of the facts and background of the case:

> [Sabella] . . . obtained the oil, gas, and mineral rights (OGMs) to the subject property at a tax sale on September 8, 1997. . . . The property was . . . properly recorded . . . in the Warren County Register and Recorder's Office in 1997. [Sabella] did not own the surface rights to the property. However, there being a public road near the property, Keller Road, [Sabella] did drive the public road looking for any signs of development. Finding none, he operated under the assumption that there was no oil and gas development activity.
>
> The piece of property at issue is a rural, wooded parcel of land, covered by trees and brush. The property is not on a main road. Also, there is just one home nearby the surface of the property at issue. Further, [Sabella] suffered from progressive macular degeneration. Eventually, [Sabella's] condition prevented him from driving a vehicle.
>
> [Appalachian was] unrepresented in the instant action. Appalachian is and was at all times relevant, an oil and gas company operating in and around Warren, Pennsylvania.

Appalachian was owned by Russell C. Southwell, Lee Borger, Jr., and Ted Carrington.

On November 15, 2001, Mark and Virginia Harvey ["the Harveys"] owned the surface rights to 104 acres above the 66 subsurface acres [that Sabella] owned. Appalachian signed an oil and gas lease with Mark and Virginia Harvey in 2001.[1] The lease was for production of the 104 acres of oil and gas rights underneath the Harvey surface tract. Appalachian called this lease the "Harvey lease," and duly recorded it at the Register and Recorder's Office . . . . However, unbeknownst to either party to the Harvey lease, 66 of those 104 subsurface acres were already owned by [Sabella].

> [1] Mark and Virginia Harvey are not parties to the instant action. [The Haners] sought to interplead Mark and Virginia Harvey, but this Court denied the request as untimely.

Defendants Brian C. Haner and Lisa M. Haner are husband and wife, trading and doing business under the registered fictitious name Pine Ridge Energy (Pine Ridge). Pine Ridge is an unincorporated business association. On June 23, 2003, Appalachian, by and through three of its shareholders, signed a letter of agreement to sell some of its holdings to Defendant Brian Haner . . ., operating as Pine Ridge. Pine Ridge then finalized the purchase of Appalachian in August 2003. As part of the agreement of sale, Appalachian warranted good, marketable title. Included in Pine Ridge's purchase was the Harvey lease, which included [Sabella's] 66 acres of OGMs.

In effectuating the purchase of Appalachian, Pine Ridge retained the services of local attorney Arthur Stewart. Mr. Stewart advised[2] Brian Haner of his title search options when acquiring the Appalachian leases. Mr. Stewart informed Haner he could either (1) obtain no title search, (2) obtain a "bring-down" title search,[1] or (3) obtain a full title search. Stewart and Haner

_____

[1] A bring-down title search has been described as follows:

A "bring down" search is the final review of the prothonotary's and recorder of deeds' records to determine if there have been any intervening events [that] affect the title to be conveyed at a

*(Footnote Continued Next Page)*

discussed approximate costs and risks associated with each of the options. Haner opted for the middle option, performing only a "bring-down" title search on the Harvey lease. Pine Ridge also acquired the drilling rights to adjacent properties, and began producing adjacent properties.

[2] Attorney-client privilege was waived for purposes of this testimony.

When [the Haners] obtained the subject property, there were two existing oil and natural gas wells on the subject property [denominated Wells H-1 and H-2] . . . . Subsequently, seven more wells were drilled by [the Haners] from 2004-2008 [denominated Wells H-3 through H-9] . . . . On March 8, 2008, [Sabella] met Brian Haner. Drilling was completed on Well H-7 on August 14, 2008. Drilling was completed on Well H-8 on August 20, 2008. And finally, drilling was completed on Well H-9 on August 26, 2008. In total, nine (9) wells were drilled on the Sabella subsurface property. Those nine wells produced both oil and gas.

The "Harvey wells" (producing from [Sabella's] OGMs) were not separately metered from surrounding wells. Rather, to collect the oil and gas from the wells, the wells were connected with wells producing [on] nearby properties. Royalty checks were disbursed by tallying the number of wells producing in the area, and dividing the total wells by each OGM lessor's wells.

As Pine Ridge continued to expand its operations, [the Haners were] considering selling ash timber and leasing more OGMs. In early 2008, [Brian] Haner was attempting to get in touch with a

*(Footnote Continued)* ───────────────

settlement between the time the original title abstract is prepared and the time of settlement. It is the generally accepted practice among title abstractors to do a settlement "bring down" as close in time as possible to the date of settlement. If a settlement is scheduled for 9:00 a.m., it is prudent and generally accepted among title abstractors to do a bring down search during the afternoon prior to the settlement.

*Penn Title Ins. Co. v. Intercounty Abstract*, 31 Pa. D. & C.3d 635, 642 (Montgomery Cty. 1984).

potential business contact who[] he knew used to work for someone of the last name "Sabella." So, [Brian] Haner began calling "Sabellas" in the phone book. Ultimately, he reached [Sabella] . . . and the two individuals planned to meet to discuss business opportunities. On March 8, 2008, [Brian] Haner met Sabella at his house and the two drove to McKean County to examine a lease Sabella owned. The parties then examined another property that Sabella owned in Frewsburg, New York, had lunch, and returned to Sabella's house to continue discussing the oil and gas business.

Upon arrival at Sabella's house, the two parties discussed the 66 acres that Sabella owned in Warren County. [Brian] Haner also began discussing with Sabella other locations where [the Haners], doing business as Pine Ridge Energy, [were] operating. [Brian] Haner told Sabella he operated "between Irvine Run and Keller Road" in Conewango Township. Sabella responded that he owned [OGMs] there. Sabella then produced a map of the area. [Brian] Haner recognized the map as the area [the Haners were] then currently producing. However, [Brian] Haner did not explicitly tell Sabella that [the Haners were] on the property.

There was conflicting testimony about precisely what was said as the parties examined this map at the meeting of March 8, 2008. This [c]ourt, after observing the witnesses, assessing the witnesses' credibility, and examining the totality of the circumstances, determines that [Brian] Haner *did not* tell [Sabella] that Pine Ridge was operating on [Sabella's] property. In fact, [Brian Haner] made statements to [Sabella] that would have indicated to a reasonable person that there was no oil and gas activity occurring on the property but that he was very close to [Sabella's] property. Furthermore, the effect of [Brian] Haner's statements to Sabella were such that Sabella believed he did not need to worry about that piece of property being developed, even if Sabella did not know precisely where the boundary lines were drawn. On the other hand, Sabella assured [Brian] Haner they would work out something with respect to royalties and not to worry in the event [that the Haners were] on the land.

Rather than speak with his attorney regarding title, [Brian Haner's] immediate response was to meet with Appalachian's partners who assured him he had good title. However, [the Haners] did not obtain a title search on the property after this meeting. [The Haners] did not escrow the funds of the oil and

gas proceeds after this meeting. [The Haners] did not pay royalties to [Sabella]. [The Haners] even continued to develop the property. Following the March 8, 2008[] meeting, [the Haners] expanded production on the Harvey lease, drilling an additional three (3) wells on the property in August 2008 to bring the total [number of] wells on Sabella's OGMs to nine (9).

[The Haners] continued to produce oil and gas from the 66 subsurface acres. On March 10, 2010, this suit in ejectment, trespass and conversion was filed by [Sabella].

Trial Court Opinion ("T.C.O."), 1/25/2013, at 3-8 (record citations and one footnote omitted; emphasis in original).

The trial court also has provided the following procedural history:

[Sabella] filed a Complaint on March 10, 2010 asserting three causes of action: Count I—Ejectment; Count II—Conversion; and Count III—Trespass. [The Haners] filed an Answer and New Matter to Complaint on June 17, 2010. [Sabella] responded by filing an Answer to New Matter on June 25, 2010. On the same date, [Sabella] filed a Motion for Partial Summary Judgment seeking judgment as a matter of law as to [ejectment] and judgment [only] on the issue of liability . . . on Counts II and III.

[The Haners] filed a Motion for Leave to Join Additional Defendants [*i.e.*, the Harveys] on June 30, 2010. On September 13, 2010, this [c]ourt issued a Memorandum Opinion and Order denying [the Haners'] Motion for Leave . . . and granting [Sabella's] Motion for Partial Summary Judgment.

One week later, on September 20, 2010, [Sabella] filed a Motion for Entry of Final Appealable Order Pursuant to Pa.R.A.P. 341, which sought the entry of a final order regarding Count I—Ejectment. On the same date, this [c]ourt granted said Motion and judgment in ejectment was entered in favor of [Sabella] and against [the Haners]. No appeal of that Order was taken by either [Sabella] or [the Haners].

* * * *

On June 29, 2012, [the Haners] filed a Motion for Summary Judgment. This [c]ourt denied [the Haners'] Motion for Summary Judgment by Order dated August 27, 2012 . . . .

- 6 -

A three-day bench trial on the merits of the case commenced on August 29, 2012. At trial, the sole remaining issue[s] for this [c]ourt's consideration [were] damages as to Counts II and III, Conversion and Trespass, respectively.

At the bench trial, no separate witnesses were presented on behalf of [Sabella]. [Sabella] was called as on cross-examination by [the Haners]. [The Haners] called Brian Haner, . . . Ted Carrington, Arthur J. Stewart, John M. Sveda, and Lauri L. Sekerak. At the conclusion of the trial, the [c]ourt directed the parties to file written closing statements along with proposed findings of fact and conclusions of law for this Court's consideration. Each party filed [proposed findings and conclusions] by November 15, 2012.

T.C.O., 1/25/2013, at 2-3.

Thereafter, for reasons set forth in a detailed and comprehensive thirty-four-page memorandum opinion, the trial court found the Haners liable for trespass (both good-faith and bad-faith) and conversion, and entered judgment on April 8, 2013, in favor of Sabella in the amount of $249,972.30. Both parties filed post-trial motions, which the trial court denied in material part in a memorandum opinion and order entered on April 2, 2013. On April 25, 2013, the Haners filed the instant appeal. On May 6, 2013, Sabella filed the instant cross-appeal. The trial court directed the parties to file concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), and the parties timely complied. On June 20, 2013, the trial court filed its Rule 1925(a) opinion addressing the parties' respective issues, primarily by reference to its earlier opinions in this matter. The case now is ripe for our review.

**DISCUSSION**

The respective parties to this cross-appeal raise more issues than warrant verbatim reproduction. Taken in sum, they may be grouped into several categories, which, in service of clarity and expedience, we will address in turn by topic rather than by the party raising the particular issue, although the Haners raise considerably more issues than Sabella. Thus, we begin by addressing those arguments that would entirely invalidate the underlying judgment. First, we must address the Haners' challenge to the trial court's subject matter jurisdiction for Sabella's failure to join an indispensable party. Second, we will address the Haners' contention that the statute of limitations barred Sabella's claims in their entirety. Next, we take up other issues, including the Haners' challenge to the trial court's grant of summary judgment in favor of Sabella on his claims for ejectment. Once we have explained why these issues do not warrant relief, we address each party's challenges to the results of the trial in this matter, which encompass liability, damages, and other matters.

**I.     Subject Matter Jurisdiction**

Taking the Haners' last issue first, we consider their claim that the Harveys, as parties who purported to lease Sabella's now-undisputed rights to the oil and gas in question, were indispensable parties. *See* Brief for the Haners at 67-69. The Harveys were the undisputed owners of the surface rights over Sabella's OGMs, and mistakenly purported to lease those rights to the Haners.

Under Pa.R.C.P. 2227, a "[p]erson[] having only a joint interest in the subject matter of an action must be joined on the same side as plaintiffs or defendants."

> As a general rule, an indispensable party is one whose rights are so connected with the claims of the litigants that no decree can be made without impairing its rights. Appellate courts have consistently held that property owners are indispensable parties in lawsuits concerning the owners' property rights.
>
> The absence of an indispensable party goes absolutely to the court's jurisdiction. If an indispensable party is not joined, a court is without jurisdiction to decide the matter. The absence of an indispensable party renders any order or decree of the court null and void. The issue of "the failure to join an indispensable party" cannot be waived.

*Hart v. O'Malley*, 647 A.2d 542, 549 (Pa. Super. 1994) (citations omitted).[2]

The trial court rejected the Haners' contention upon the basis that "the only necessary or indispensable party defendant to an ejectment action is the person in actual possession, and, where such land is under lease, it is the tenant, not the landlord, who constitutes the only necessary or indispensable party." T.C.O., 6/20/2013, at 4 (citing *Bannard v. N.Y. State Natural Gas Co.*, 172 A.2d 306, 310 (Pa. 1961)). Noting that the

_____

[2] That the issue cannot be waived is why we will spend no time addressing the trial court's assertions that the Haners did not assert indispensable party as a basis for joinder in their Motion for Leave to Join Additional Defendants and that the Haners' motion was filed out of time. *See* T.C.O., 6/20/2013, at 4-6. Regardless of whether, when, or how the Haners raised the indispensable party issue, the jurisdictional challenge is ripe for review.

parties in possession of the oil and gas estate at issue in this case were the Haners, not the Harveys, the court found that the Harveys were not indispensable parties to the ejectment action. *Id.*; *cf. Hicks v. Amer. Natural Gas Co.*, 57 A. 55, 58 (Pa. 1904) (finding that possession lay with the gas lessee because it had drilled a well and had the gas "in [its] control").

The Haners argue as follows:

> The Harveys are indispensable parties to this action because they have a joint interest in the subject matter of the litigation: the [OGMs]. That they asserted such an interest is patently obvious as they gave a lease that covered all of the [OGMs]. The [trial court's Rule 1925(a)] opinion demonstrates even more plainly how the Harveys are indispensable. The trial court wrote that "[h]ere, the issues were essentially '*who owned the [OGMs*.]'" [T.C.O., 6/20/2013, at 4 (emphasis added)]. However, the Harveys undeniably believed they owned the [OGMs,] having leased the same to [the Haners]. Moreover, the trial court went on to conclude that[,] "by definition, the Harveys were not indispensable parties because they *did not possess or own the* [*OGMs*]." [*Id.* (emphasis added)].

> * * * *

> Because the court ruled that [the Haners] did not own the [OGMs], by extension it ruled that the Harveys did not own [them] as well. That this was the net[ ]effect of the court's ruling is clearest when one reviews the impact the court's ruling had on the Harveys. This resulted in the practical termination of the lease as to the Harveys[, a] lease from which they use[d] to receive royalties.

Brief for the Haners at 68-69.

Sabella responds that, in **Bannard**, our Supreme Court held that ejectment, being strictly a possessory action, does not require the appearance of all parties with a potential claim to the underlying title:

> The writ is served upon the one found in possession, rather than upon the one who may chance to have title. If the one in possession happens to be a tenant, his landlord may intervene and defend; if he does not choose so to do, and judgment be obtained against the tenant, the landlord cannot then intervene to prevent the plaintiff in ejectment from taking possession. The possession of the tenant is the possession of the landlord; therefore the ejectment, whilst it may have no effect in determining the question of title as between the plaintiff and the lessor, does determine the right of possession.

172 A.2d at 310. Sabella also notes that the Harveys were barred from intervening relative to the trespass component of Sabella's action because by **purporting** to grant a lease to the Haners that allowed the Haners to remove oil and gas for as long as operations continue – precisely the reason the Haners claim the Harveys were indispensable parties – the Harveys surrendered a fee simple determinable, with only a reversionary interest that is triggered only if and when production of oil and gas ceases. **See Snyder Bros. v. Peoples Natural Gas Co.**, 676 A.2d 1226, 1230 (Pa. Super. 1996). Thus, the Harveys, even taking such conjectural claims of ownership at face value, had neither a possessory right nor an ownership interest upon which to raise a trespass action unless and until the reversionary interest vested.

As presented, the Haners' argument ultimately is drawn from our larger body of law concerning indispensable parties. It provides no answer

- 11 -

to the trial court's reasoning or the more closely on-point authority cited by Sabella, which indicates that the Harveys' joinder in this action, even if permissible, was not necessary as a matter of law to establish the trial court's jurisdiction. Accordingly, we agree with the trial court that the Harveys were not indispensable parties to this action. Thus, the trial court's jurisdiction cannot be challenged upon this basis.

## II. The Statute of Limitations

The trial court determined that the applicable two-year statutes of limitation, which facially would bar all of Sabella's claims (or at least would preclude damages for certain time periods encompassed by the lawsuit),[3] were tolled for two alternative and independent reasons: First, the court found that the discovery rule tolled the statute of limitations, and, second, the court concluded that the doctrine of fraudulent concealment also tolled the statute of limitations at least for the two years preceding Sabella's March 8, 2008, conversation with Brian Haner, which conversation gave each person cause to suspect that the Haners were taking oil and gas to which Sabella held title. The Haners raise a series of related arguments against each of these findings. *See* Brief for the Haners at 38-52. However, because we find that the court did not err in its application of the discovery rule, the application of the doctrine of fraudulent concealment is moot.

_____

[3] *See* 42 Pa.C.S. §§ 5524(3), (4) (conversion and trespass, respectively).

"There is a strong policy in Pennsylvania courts favoring the strict application of statutes of limitation[]. Statutes of limitation[] are designed to effectuate three purposes: (1) preservation of evidence; (2) the right of potential defendants to repose; and (3) administrative efficiency and convenience." *Kingston Coal Co. v. Felton Min. Co., Inc.*, 690 A.2d 284, 288 (Pa. Super. 1997) (citations omitted). For these reasons, "a party asserting a cause of action is under a duty to use all reasonable diligence to be properly informed of the facts and circumstances upon which a potential right of recovery is based and to institute suit within the prescribed statutory period." *Id.* (quoting *Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*, 468 A.2d 468, 471 (Pa. 1983)). However, this obligation is qualified by the "discovery rule":

> [T]he start of the statutory limitation on an action in tort may be delayed by plaintiff's ignorance of his injury and its cause, until such time as he could or should have discovered it by the exercise of reasonable diligence. *Lewey v. Fricke Coke Co.*, 31 A. 261 (Pa. 1895); *see Anthony v. Koppers Co., Inc.*, 425 A.2d 428, 431-35 (Pa. Super. 1981), and cases cited therein; *Gee v. CBS, Inc.*, 471 F.Supp. 600, 617 (E.D.Pa. 1979).
>
> The plaintiff has the burden of justifying any delay beyond the date on which the limitation would have expired if computed from the date on which the acts giving rise to the cause of action allegedly occurred. He must allege and prove facts [that] show that he made reasonable efforts to protect his interests and [that] explain why he was unable to discover the operative facts for his cause of action sooner than he did. *Patton v. Commonwealth Trust Co.*, 119 A. 834, 836 (Pa. 1923). Where the facts are neither disputed nor close, the decision on reasonableness is made by the court as a matter of law, instead

- 13 -

of by the jury as a matter of fact. **A. J. Aberman, Inc. v. Funk Bldg. Corp.**, 420 A.2d 594 (Pa. Super. 1980).

**Bickell v. Stein**, 435 A.2d 610, 612 (Pa. Super. 1981) (citations modified; footnote omitted); **Kingston Coal**, 690 A.2d at 288 (quoting **Colonna v. Rice**, 664 A.2d 979, 980 (Pa. Super. 1995))("The 'discovery rule' provides that where the existence of the injury is not known to the complaining party and such knowledge cannot *reasonably be ascertained* within the prescribed statutory period, the limitations period does not begin to run until the discovery of the injury is *reasonably possible*." (emphasis added in **Kingston Coal**)).

We must emphasize that "[w]hether the statute [of limitations] has run on a claim is usually a question of law for the judge, but where . . . the issue involves a factual determination, *i.e.*, what is a reasonable period, the determination is for the jury." **Smith v. Bell Tel. Co.**, 153 A.2d 477, 481 (Pa. 1959); **see Kingston Coal**, 690 A.2d at 288 ("The question of due diligence in discovering an injury, as it relates to a statute of limitations defense, is usually one for a jury's consideration."). Thus, inasmuch as the Haners contest the trial court's determination that Sabella exercised reasonable diligence in protecting his property interests, the issue presents a mixed question of law and fact.

The Haners argue first that the trial court erroneously shifted the burden of disproving application of the discovery rule to the Haners, when the burden of establishing the discovery rule should have rested upon

Sabella.  Brief for the Haners at 39-41.  In particular, the Haners focus upon the following discussion by the trial court as evidence of impermissible burden-shifting:

> A defendant asserting an affirmative defense has the burden of proof as to that affirmative defense.  ***Reott v. Asia Trend, Inc.***, 55 A.3d 1088, 1092 (Pa. 2012).  As the party asserting the affirmative defense of the statute of limitations, [the Haners] bore the initial burden of establishing that the action was filed after the applicable period would have expired, had it started to run at the time the cause of action accrued.  ***Westinghouse Elec. Corp. v. Penna. Dep't of Env'l Protection***, 705 A.2d 1349, 1351 (Pa. Cmwlth. 1998).  If the defendant meets that criterion, then the burden would shift to the plaintiff to justify the delay in suit.  ***Id.***  In other words, only after the defendant meets his burden of proof that the statute of limitations should bar some portion of the remedy does the burden of proof on the discovery rule shift to the plaintiff.
>
> Here, the burden was on the [Haners] to prove the affirmative defense of the statute of limitations.  [They] did not adduce enough evidence at trial to persuade the Court that the statute of limitations should bar any portion of [Sabella's] remedy in the instant action.

T.C.O., 4/2/2013, at 2-3 (citations modified).

We agree with the Haners on this point.  It cannot be disputed that the Haners aptly pleaded that the statute of limitations applied to bar Sabella's claims.  The alleged trespass and conversion, subject to two-year statutes of limitation, undisputedly began in 2003, approximately seven years before Sabella filed the instant suit.  Thus, upon the establishment of that basis for the application of the statute of limitations, the burden shifted to Sabella to establish that the discovery rule tolled the statute until 2008 in order to make his 2010 suit timely.  However, the trial court's brief analysis, as set

- 15 -

forth above, does not overwhelm that court's own more detailed observations in which it had correctly allocated the relevant burden of proof to Sabella.

In its earlier opinion explaining why it denied the Haners' motion for a non-suit, the trial court unequivocally recited and applied the correct standard:

> Here, [Sabella] did not have actual knowledge that [the Haners were] producing oil and gas out of his subterranean land holdings until within the two[-]year period before he filed suit on March 10, 2010. Next the Court considers whether, by the exercise of reasonable diligence, [Sabella] could have discovered his injury.
>
> [The Haners] posit that the party seeking to invoke the discovery rule bears the burden of establishing the inability to know of the injury despite the exercise of reasonable diligence. ***Pocono Int'l Raceway***, 468 A.2d at 471. [The Haners asserted] that the standard of reasonable diligence is objective, not subjective. In other words, the standard is not a standard of reasonable diligence unique to a particular plaintiff, but instead, a standard of reasonable diligence as applied to a "reasonable person." ***Dalrymple v. Brown***, 701 A.2d 164, 167 (Pa. 1997).
>
> While [the Haners] have applied the proper standard of law, **this Court holds that [Sabella] has met his burden of establishing** that he was unaware of the trespass and **that a reasonable person would not have discovered the trespass and conversion occurring on his subterranean holdings based upon the location of the development.**

T.C.O., 1/25/2013, at 9-10 (citations modified; emphasis added).

In explaining its conclusions, the trial court marshalled the following facts, all of which find ample support in the record:

> [Sabella] first purchased his 66 acres of oil and gas rights in 1997 at a tax sale. [Sabella] recorded the deed upon his

purchase in 1997. He examined the surface of the parcel of land after purchasing it. [Sabella] observed no oil and gas production on the instant property at the time that he purchased it. Given that Pennsylvania has very strong protections as a "race-notice" state, 21 P.S. § 351,[4] it [was] reasonable for [Sabella] to have assumed that his [OGMs] would be protected by virtue of his having recorded his 1997 oil and gas deed.

Here, [Sabella] did not own the surface rights to either the instant property or the adjacent properties. When he did examine the property, he stayed on the public road that was near the parcel and saw no activity. Testimony adduced at trial also indicated that [Sabella] occasionally drove Keller Road looking for timber, but found no oil and gas development on his property. Nobody told [Sabella] about development on the property. There was no reason for [Sabella] to believe development was occurring on the instant property.

The surface of the property at issue was covered with trees and brush. The property was in a rural area. It was secluded. . . . Someone on the nearby road probably would not have seen the wells. There was only one house in the nearby area, and that house was owned by John Sveda. Some of the wells were visible

_____

4 Section 351 requires the recordation of "[a]ll deeds, conveyances, contracts, and other instruments of writing wherein it shall be the intention of the parties . . . to grant, bargain, sell, and convey any lands, tenements, or hereditaments situate in this Commonwealth." Section 357 of the same chapter provides as follows:

The legal effect of the recording of such agreements shall be to give constructive notice to subsequent purchasers, mortgagees, and/or judgment creditors of the parties to said agreements of the fact of the granting of such rights or privileges . . ., and the rights of the subsequent purchasers, mortgagees, and/or judgment creditors of the parties to said agreements shall be limited thereby with the same force and effect as if said subsequent purchasers, mortgagees, and/or judgment creditors had actually joined in the execution of the agreement or agreements aforesaid.

21 P.S. § 357. The topic of constructive notice and its bearing upon this case is taken up in section IV.A, *infra*.

from [Sveda's] deck.  However, Sabella did not have the type of relationship with [Sveda] such that he would be at [Sveda's] house looking for oil and gas wells in his yard. . . .  [T]here was no activity on nearby Keller Road that would have indicated oil and gas activity was occurring.  The first two wells [the Haners] drilled were not visible from Keller Road.  The pump jacks for the wells were also not visible from Keller Road.  Furthermore, [Sveda] testified [that] there is only one spot on Keller Road [from which] one can actually see one of the wells while driving on the road.  Sveda also testified that you needed binoculars and needed to know what you were looking for to [see a well] from Keller Road.

Based on these facts, **the Court finds that a reasonably prudent landowner exercising reasonable efforts would not have discovered the oil and gas production on the 66 acres at issue**. . . .  [Sabella] has proven here that even exercising reasonable efforts, one would not have learned of the production on the property.

T.C.O., 1/25/2013, at 11-12 (emphasis added; record citations and footnote omitted).

We accept this lengthy explanation of the trial court's reasoning as an accurate account of the considerations that drove the court's ruling, rather than the much briefer account provided in its April 2, 2013 Rule 1925(a) opinion, especially insofar as the trial court, in its April 2 opinion, cited the January 25 opinion as providing the full explanation of the basis for the court's reasoning.  T.C.O., 4/2/2013, at 3 ("The factual foundation for this decision has already been addressed at length in the Court's January 25,

2013 Memorandum Opinion."). That leaves the question of whether the trial court's application of the law to those facts was in error.[5]

In support of their argument that the trial court did so err, the Haners contend that **Kingston Coal**, *supra*, controls this case in their favor. In that case, the complaining party in a conversion claim contested the trial court's ruling that the statute of limitations barred its claim, and this Court affirmed. At issue in that case was whether the claimant had exercised reasonable diligence in detecting coal mining activity on certain property under which the claimant owned the subterranean coal rights. The coal had been removed in a strip-mining operation, with the attendant substantial surface disruption. As well, the mining operation was located within 800 feet of public roads for a six-month period, during which time 1,144 trucks hauled coal from the site during daylight hours. As well, a mining permit relative to the property was advertised in at least one local newspaper and a sign was posted on the land where it intersected a township road, advising that a mining permit had been issued for the property. The claimant at all relevant times lived fewer than four miles from the site of the mining activity. **Kingston Coal**, 690 A.2d at 289. We concluded that, "due to the long-term, open and obvious nature of the mining and reclamation activity taking

_____

[5] We review such questions of law *de novo*, and the scope of our review is plenary. **Stamerro v. Stamerro**, 889 A.2d 1251. 1257 (Pa. Super. 2005).

place on [the property], it was reasonably possible for any person having an interest in the coal estate . . . to realize that [his or her] interests might be in jeopardy." *Id.* at 289-90.

The Haners argue that the facts in this case are analogous to those in *Kingston Coal*. As in *Kingston Coal*, the activity in the instant case was on the surface. As in *Kingston Coal*, the activity here was open and involved an expanding operation that required the felling of trees and other changes to the property. However, the trial court found the instant case distinguishable from *Kingston Coal* in several telling particulars. As noted in the trial court's thorough recitation of the facts, the drilling activity, for practical purposes, was not visible from a public road to a person exercising reasonable diligence to inform himself of any such activity. Nor was evidence presented to suggest that the equivalent of other *Kingston Coal* factors were present: The Haners' activities did not result in a radical increase in truck traffic, and there was no public signage or publication notice of the mining activity. As well, it is reasonable to maintain that strip mining only 800 feet from a public road is more open and obvious than quieter, less disruptive drilling activity that is sufficiently set back as to be nearly invisible from any adjacent public road. Furthermore, in properly recording his deed to the OGMs, Sabella reasonably could expect that anyone seeking to drill on the property would learn through a title search of Sabella's interest.

The Haners object to two other aspects of the trial court's recital of its reasons for denying their motion for non-pros based on the statute of limitations. First, they argue that the court signaled its reliance upon impermissible considerations when it suggested that Sabella's legal blindness and his putative inability to enter upon the property because he did not own the surface estate justified his ignorance of the drilling activity. Brief for the Haners at 46-47. Second, they argue that the trial court relied too heavily, and improperly, upon Pennsylvania's constructive notice statute, in effect creating a new rule relieving a property owner of the obligation of attending to his property in person or through a proxy simply by recording his deed. Brief for the Haners at 47-48. We agree that each of these propositions is problematic under the applicable law, but we disagree that these problems alone or collectively require us to disturb the trial court's ruling.

In light of the above-recited standards, as well as the considerations that we find dispositive in the instant case, little need be said with regard to Sabella's blindness. Because the reasonable diligence test generally requires an objective, "reasonable person" inquiry, any impediments to a given individual's ability to survey his or her property are of limited relevance. However, the Haners are incorrect that Pennsylvania law holds unequivocally that such a party-specific consideration may never play into the inquiry. To the contrary, in **Crouse v. Cyclops Industries**, our Supreme Court held that, "although reasonable diligence is an objective rather than a subjective

standard, 'it is sufficiently flexible . . . to take into account the difference[s] between persons and their capacity to meet certain situations and the circumstances confronting them at the time in question.'" 745 A.2d 606, 611 (Pa. 2000) (quoting **Burnside v. Abbott Laboratories**, 505 A.2d 973, 988 (Pa. Super. 1985)).

We are similarly unpersuaded that Sabella's subterranean rights to the property authorized him to enter the surface estate with impunity. While it certainly is true that Sabella had the right of access to his OGMs, which might require entry upon the surface estate, *see Chartiers Block Coal Co. v. Mellon*, 25 A. 597, 599 (Pa. 1893), it is not clear that Sabella's regular entry upon the property to look around would be characterized fairly as an exercise of that relatively narrow right. In **Lewey**, *supra*, our Supreme Court observed that "[t]he owner of land may be present by himself or his servants on the surface of his possessions, no matter how extensive they may be. He is for this reason held to be constructively present wherever his title extends." 31 A. at 264. In that case, however, the owner in question owned the entire fee to the property in question, including the surface estate. Thus, the Court did not face the question of whether or to what extent regular entry upon another party's estate merely to look around is permissible as part and parcel of the right of access, or

whether such regular entry is necessary in an exercise of reasonable diligence *vis-à-vis* the goings-on relative to his subterranean estate.[6]

Ultimately, the trial court's fact-finding measuring Sabella's diligence relative to an essentially objective standard is supported by the record and does not clearly run afoul of any of the legal authorities cited by the Haners. We do not lightly disturb the trial court's fact-finding, and the court's application of the law to the facts is not erroneous under the circumstances of this case. We agree with the Haners that Sabella's legal blindness does not conclude the reasonable diligence inquiry. We also agree that our case law does not support the proposition that merely recording a deed in all instances relieves a party of an obligation of affirmative observation in protecting his interests. However, we do not read the trial court as having relied critically upon either basis or both of them. To the contrary, as set forth at length above, the trial court plainly relied upon a suite of case-specific factors, properly viewed through an objective, reasonable-person standard, not one substantially tailored to Sabella's personal circumstances

---

[6]    Interestingly, the trial court in this case observed (albeit without citation to the record) that, under other procedural circumstances, the Haners had made an issue of Sabella's entry upon the land overlaying Sabella's OGMs. *See* T.C.O., 1/25/2013, at 11 n.5 ("It would be unreasonable to expect the subsurface owner to regularly trespass on the surface owner's property. The fact that the parties complained at trial about [Sabella] entering the surface owner's land to obtain photographs of the wells at issue for trial illustrates the type of issues that may arise when a visitor to the property enters upon the land.").

or condition. Accordingly, we find that the trial court did not err as a matter of law or abuse its discretion in applying the discovery rule to toll the statute of limitations under the circumstances of this case.

### III.  Summary Judgment

We may dispense quickly with the Haners' challenge to the trial court's entry of summary judgment in favor of Sabella on his ejectment claim. The Haners argue that, because Sabella filed his motion for summary judgment immediately upon the closing of the pleadings, they were denied the opportunity to seek discovery that might lead to the establishment of a fact dispute regarding the ejectment action. Brief for the Haners at 61-62. The Haners cite a number of cases for boilerplate propositions regarding the standards applicable to the presentation, opposition, and decision of a motion for summary judgment, but provide no authority to support their particular argument. Furthermore, and most importantly, they do not provide a record citation documenting their preservation of this objection.

This is problematic for the Haners' argument, inasmuch as they evidently failed to exercise their prerogatives affirmatively to seek relevant discovery under Pa.R.C.P. 1035.3(b). They did not raise the issue during summary judgment proceedings and do not claim before this Court that they were denied the opportunity to do so. Furthermore, Sabella notes, the Haners did request additional time specifically to obtain certain tax records pertaining to Sabella's chain of title but for no other purpose. The court denied the Haners' request as moot because the records in question were

furnished to the Haners either before or during the pendency of the motion. Finally, Sabella notes that approximately forty days passed between his filing of a motion for summary judgment and the argument the trial court heard regarding that motion, precluding any suggestion that the Haners did not have ample time to request further delay and/or seek (perhaps further) discovery. Second Brief for Sabella at 24-25.

The trial court did not address this issue in detail, noting that, "to the extent [the Haners] complain of outstanding 'genuine issue of material fact' precluding the entry of summary judgment, [the Haners] have not expressly identified those factual issues with sufficient particularity such that the [trial court] may address them presently." T.C.O., 6/30/2013, at 3. Citing the fact that, when faced with an "overly vague or broad" Rule 1925(b) statement, a court may deem the issue waived, *id.* (citing *Majorsky v. Douglas*, 58 A.3d 1250, 1258 (Pa. Super. 2012)), the trial court opted not to take up that aspect of the Haners' complaint regarding the entry of summary judgment.

The Haners have not established that they preserved this objection before the trial court, and they have no response to Sabella's assertions regarding the summary judgment proceedings, which account is consistent with the certified record. Furthermore, we agree with the trial court that the Haners' Rule 1925(b) statement was insufficient to apprise the trial court of the specific arguments made before this Court. Thus, the Haners arguably have waived the issue for several distinct reasons. *See* Pa.R.A.P. 302

("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."); 1925(4)(ii), (vii) (requiring that errors be stated "with sufficient detail to identify all pertinent issues for the judge," and authorizing waiver for non-compliance). And in any event, they fail to set forth a sound basis for relief from the trial court's entry of summary judgment upon Sabella's ejectment claim. Thus, we will not disturb the trial court's entry of summary judgment in Sabella's ejectment action.

## IV. Trial

This brings us to the numerous issues raised by each party with regard to various factual findings and legal conclusions that the trial court made following the bench trial on Sabella's claims for trespass and conversion.

### A. Good-Faith Trespass Versus Bad-Faith Trespass

The parties do not dispute that the general framework for the computation of damages arising from a trespass distinguishes between innocent or good-faith trespasses and trespasses committed in bad faith. Stated broadly, when improvements to land are made by a good-faith trespasser, the injured party is entitled, in effect, to the trespasser's net profits, *i.e.*, the revenues generated upon the land less the moneys expended in facilitating the profitable activity. However, when a party trespasses in bad faith, the injured party is entitled to all moneys derived from the trespass without any offset for the cost of generating those moneys. *See **Matthews v. Rush***, 105 A. 817, 818 (Pa. 1919); ***Crawford v. Forest Oil Co.***, 57 A. 47 (Pa. 1904); ***Appeal of Coleman***,

62 Pa. 252, 278-79 (Pa. 1869); ***Herdic v. Young***, 55 Pa. 176, 178-79 (Pa. 1867); ***see also United States v. Wyoming***, 331 U.S. 440, 458 (1947) ("[O]ne who 'willfully' or 'in bad faith' trespasses on the land of another, and removes minerals, is liable to the owner for their full value computed as of the time the trespasser converted them to his own use, by sale or otherwise, but . . . an 'innocent' trespasser, who has acted 'in good faith,' may deduct from such value the expenses of extraction.").

In the instant case, the trial court found that the Haners were good-faith trespassers from the Haners' commencement of drilling activities in 2003 until the fateful March 8, 2008 conversation between Brian Haner and Sabella, during which, the trial court determined, the Haners learned or should have learned that they might be trespassing upon Sabella's property. Thereafter, in not only continuing but indeed expanding production by drilling three additional wells without making adequate efforts to ascertain Sabella's potential interest in the oil and gas extracted from the property or to compensate him, the Haners (as determined by the trial court) acted in bad faith until their cessation of oil and gas drilling and production in 2011. ***See*** T.C.O., 1/25/2013, at 18-21.

The Haners raise several challenges to the trial court's rulings in this regard. They maintain that the trial court erroneously applied an objective test for bad faith, rather than determining whether the Haners actually acted in bad faith, a subjective inquiry. ***See*** Brief for the Haners at 52-57. The Haners also contend that the trial court's determination that the Haners

acted in good faith until March 2008 barred the trial court as a matter of law from finding that they acted in bad faith thereafter. *Id.* at 57-61.

By contrast, Sabella maintains that the trial court erred in finding that the Haners acted in good faith at any time relevant to this case. Because his interest in the OGMs duly was recorded years before the Haners' trespass, Sabella contends that the Haners were on constructive notice of that interest and, therefore, trespassed upon Sabella's OGMs in bad faith for the entire duration of the drilling operation. Consequently, Sabella maintains that the trial court erred in allowing the Haners any offsets whatsoever. Brief for Sabella at 6-13.

For the reasons that follow, we agree with Sabella. Because we agree that the Haners were on constructive notice of Sabella's interest in the subject property, and that the Haners therefore acted in bad faith for the entire period of their trespass upon Sabella's OGMs, the Haners' arguments with regard to the trial court's rulings on good and bad faith, all of which pertain to the trial court's calculations of the appropriate offsets, are moot and require no discussion. Similarly, Sabella's arguments in the alternative regarding bad faith also are moot.

Sabella's argument that the Haners acted entirely in bad faith is based primarily upon Pennsylvania's constructive notice statute, which provides, in relevant part, as follows:

§ 356.  Agreements concerning real property

All agreements in writing relating to real property situate in this Commonwealth by the terms whereof the parties executing the same do grant, bargain, sell, or convey any rights or privileges of a permanent nature pertaining to such real property . . . shall be acknowledged according to law by the parties thereto or proved in the manner provided by law, and shall be recorded in the office for the recording of deeds in the county or counties wherein such real property is situate.

§ 357.     Constructive notice as result of recordation

The legal effect of the recording of such agreements [*i.e.*, deeds] shall be to give constructive notice to subsequent purchasers, mortgagees, and/or judgment creditors of the parties to said agreements of the fact of the granting of such rights or privileges and/or of the execution of said releases, and the rights of the subsequent purchasers, mortgagees, and/or judgment creditors of the parties to said agreements shall be limited thereby with the same force and effect as if said subsequent purchasers, mortgagees, and/or judgment creditors had actually joined in the execution of the agreement or agreements aforesaid.

21 P.S. §§ 356-57.

Sabella argues that only trespassers who are "good[-]faith purchasers for value without notice of the plaintiff's superior title, either actual or constructive," may offset the plaintiff's recovery of moneys obtained through mineral production by the costs of production. Brief for Sabella at 6 (citing **Boggs v. Varner**, 6 Watts & Serg. 469 (Pa. 1843)). However, notice of his trespass, actual or constructive, renders the trespasser in bad faith and precludes the application of offsets for the costs of production. **Id.** at 7-8 (citing **McCray v. Clark**, 82 Pa. 457 (Pa. 1876)). While recorded deeds may not provide constructive notice when "latencies in the record," notwithstanding recordation, relieve the trespasser of its responsibility for

informing itself as to recorded interests in the subject property,[7] Sabella contends that the Haners have recourse to no such remedy in this case, because Sabella's interest in the OGMs undisputedly was properly recorded and indexed. The oversight arose simply because the Haners willfully elected not to conduct the full title search that would have informed them of Sabella's interest. *Id.* at 8-10. Sabella thus maintains that "constructive notice will vitiate a trespassing defendant's entitlement to offset where the record is sufficiently conclusive as to the wrongfulness of the entry." *Id.* at 10.

Sabella also seeks support in the Restatement (Third) of Restitution, which, he contends, is looked upon "with favor" by Pennsylvania courts. Specifically, Sabella cites section 10 and the comments and examples appended thereto. Section 10, entitled "Mistaken Improvements," provides that "[a] person who improves the real or personal property of another, acting by mistake, has a claim in restitution as necessary to prevent unjust enrichment. A remedy for mistaken improvement that subjects the owner to a forced exchange will be qualified or limited to avoid undue prejudice to the owner." Restatement (Third) of Restitution § 10. Sabella further notes that section 69 of the Restatement indicates that "[a] person has notice of a fact

---

[7] *See* Brief for Sabella at 8-10 (citing *Stanko v. Males*, 135 A.2d 392 (Pa. 1957); *Crawford v. Forest Oil Co.*, 57 A. 47 (Pa. 1904); *Skiles v. Houston*, 20 A. 722 (Pa. 1885)).

if the person either knows the fact or has reason to know it," and that a person has "reason to know a fact if," *inter alia*, "knowledge of the fact is imputed to the person by statute (including provisions for notice by filing or recording)." *Id.* §§ 69(2), (3).

Sabella emphasizes the strength of the language of Pennsylvania's constructive notice statute, and pairs that with his apt observation that the Haners do not suggest that the recordation of Sabella's interests in the OGMs was somehow flawed. Sabella further maintains that the application of the doctrine of constructive notice to this case renders irrelevant the Haners' actual knowledge or lack thereof of Sabella's recorded interest in the property. Sabella argues that, to the contrary, the Haners must be barred from recovering any offset when they willfully left themselves ignorant of Sabella's interest by consciously, and undisputedly with the advice of counsel regarding each of their three options, declining to run complete title searches for the property, thus assuming the risk of bad-faith status.

The Haners correctly note that Pennsylvania courts have yet to adopt or apply the Restatement (Third) of Restitution in any context. However, the principles Sabella seeks to support by reference to the Third Restatement are hardly alien to Pennsylvania law. Indeed, Pennsylvania's above-cited constructive notice statute embodies many of the same ideas, at least as applies to the context of real estate transactions and disputes.

We begin with our Supreme Court's observations regarding "the unique characteristics of an oil or gas lease":

As this Court recognized in **Brown v. Haight**, "[t]he traditional oil and gas 'lease' is far from the simplest of property concepts. In the case law oil and gas 'leases' have been described as anything from licenses to grants in fee."[8]  255 A.2d 508, 510 (Pa. 1969).  Generally, however, the title conveyed in an oil and gas lease is inchoate, and is initially for the purpose of exploration and development. **Calhoun v. Neely**, 50 A. 967, 968 (Pa. 1902); **Burgan v. South Penn Oil Co.**, 89 A. 823, 826 (Pa. 1914) ("The title is inchoate, and for purposes of exploration only until oil is found." (internal quotation marks omitted)); **see also Hite v. Falcon Partners**, 13 A.3d 942 (Pa. Super. 2011) (same); **Jacobs v. CNG Transmission Corp.**, 332 F.Supp.2d 759, 772 (W.D.Pa. 2004) (same).

If development during the agreed upon primary term is unsuccessful, no estate vests in the lessee.  If, however, oil or gas is produced, a fee simple determinable is created in the lessee, and the lessee's right to extract the oil or gas becomes vested. **Calhoun**, 50 A. at 968; **Jacobs**, 332 F.Supp.2d at 772-73.   A fee simple determinable is an estate in fee that automatically reverts to the grantor upon the occurrence of a specific event. **Brown**, 255 A.2d at 511.  The interest held by the grantor after such a conveyance is termed "a possibility of

_____

[8]   To this point, one authority observes as follows:

Early decisions about oil and gas leases lack uniformity even within a given jurisdiction.  An instrument of this type has been held to be a deed, a lease, a sale, a license, and an optional contract, and the legal interest created by them has been held to be a profit *a prendre*, a corporeal hereditament, an incorporeal hereditament, an estate in land, not an estate in land, an estate in oil and gas, not an estate in oil and gas, a servitude, a chattel real, real estate, interest in land, not an interest in land, personal property, a freehold, a tenancy at will, property interest, and the relation of landlord and tenant.

1A Summers Oil and Gas § 9.5 at 190-94 (3d ed.) (footnotes omitted). Pennsylvania is among those jurisdictions that have issued occasionally contradictory rulings on these points during the past 150 years.  However, the law as set forth in the discussion to which this footnote is appended has stabilized on the questions relevant to this case.

reverter." ***Higbee Corp. v. Kennedy***, 428 A.2d 592, 595 (Pa. Super. 1981). Such a fee is a fee simple, because it may last forever in the grantee and his heirs and assigns, "the duration depending upon the concurrence of collateral circumstances which qualify and debase the purity of the grant." ***Id.*** at 595 n.4 (quoting ***Slegel v. Lauer***, 23 A. 996, 997 (Pa. 1892)).

***T.W. Phillips Gas & Oil Co. v. Jedlicka***, 42 A.3d 261, 267 (Pa. 2012) (citations modified); ***cf. Hutchison v. Sunbeam Coal Corp.***, 519 A.2d 385, 387 n.1 (Pa. 1986) (noting that "[t]he term 'lease' is in some respects a misnomer. What is really involved is a transfer of an interest in real estate, the mineral in place"; and further underscoring that the transfer "involve[s] the characteristics of a fee simple determinable in the coal, which the lease severs from" the surface interest); ***Higbee Corp.***, 428 A.2d at 595, 597 (establishing a rebuttable presumption that an oil and gas lease is a fee simple with a possibility of reverter, which vests automatically, rather than a fee simple subject to a condition subsequent, which vests only upon reentry by the lessor). More recently, this Court has held that, "[a]lthough the interpretation of oil and gas leases has proved to be troublesome for the courts of this Commonwealth, the law has developed to provide that an oil and gas lease, despite the use of the term 'lease,' actually involves the conveyance of property rights." ***Nolt v. TS Calkins & Assoc., LP***, 2014 PA Super 141, at *2 (July 7, 2014) (citing ***Szymanowski v. Brace***, 987 A.2d 717, 719-20 (Pa. Super. 2009)); ***see Lesnick v. Chartiers Natural Gas Co.***, 889 A.2d 1282, 1284-85 (Pa. Super. 2005).

We also must address an important consideration raised by the Haners in opposition to Sabella's reliance upon 21 P.S. § 357. Specifically, the Haners seek to bar section 357's application by casting themselves as occupants rather than purchasers, ostensibly because section 357's application is limited by its terms to "purchasers, mortgagees, and/or judgment creditors" of the property in question. Brief for the Haners at 13. This would appear to exclude lessees, as they are commonly understood, from the class of parties subject to imputed notice. This result would appear to be compelled by our venerable maxim of interpretation, *expressio unius est exclusio alterius*, "the inference that, where certain things are designated in a statute, all omissions should be understood as exclusions." **Commonwealth v. Charles**, 411 A.2d at 287 (Pa. Super. 1979) (internal quotation marks omitted).

Because we must strive to discern the import of sections 356 and 357, our review is governed by the following interpretive principles:

> "[T]he objective of all interpretation and construction of statutes is to ascertain and effectuate the intention of the legislature." **Bayada Nurses v. Dep't of Labor & Indus.**, 8 A.3d 866, 880 (Pa. 2010) (citing 1 Pa.C.S. § 1921(a)). Generally, the best indication of the General Assembly's intent is the plain language of the statute. "When the words of a statute are clear and free from all ambiguity, they are presumed to be the best indication of legislative intent." **Chanceford Aviation v. Chanceford Twp. Bd. of Supervisors**, 923 A.2d 1099, 1104 (Pa. 2007) (citations omitted). When, however, the words of a statute are ambiguous, a number of factors are used in determining legislative intent. Furthermore, "it is axiomatic that in determining legislative intent, all sections of a statute must be read together and in conjunction with each other, and construed

with reference to the entire statute." ***Hoffman Min. v. Zoning Hearing Bd.***, 32 A.3d 587, 592 (Pa. 2011) (citation omitted). Moreover, statutes are considered to be in *pari materia* when they relate to the same persons or things, and statutes or parts of statutes in *pari materia* shall be construed together, if possible. 1 Pa.C.S. § 1932. Courts are required, if possible, to give effect to each provision or subsection of the statute. ***Id.*** § 1921(a).

***Allstate Life Ins. Co. v. Commonwealth***, 52 A.3d 1077, 1080-81 (Pa. 2012) (citations modified). Thus, we must interpret sections 356 and 357 in *pari materia*.

Notably, section 356 requires recordation of "[a]ll agreements in writing relating to property situate in this Commonwealth by the terms whereof the parties executing the same do grant, bargain, sell, or convey any rights or privileges of a permanent nature pertaining to such real property." The question thus becomes whether section 357, read in isolation or in tandem with section 356, imputes constructive notice to oil and gas lessees, whose interest in the subject property is in the nature of a fee simple determinable.

It cannot reasonably be disputed that the written conveyance to Sabella of the OGMs at issue in this case "relat[es] to real property" that granted, sold, or conveyed rights and privileges of a permanent nature. ***See*** 21 P.S. § 356. Similarly there is no dispute in this case that the conveyance in question was duly recorded, as required by section 356. Consequently, section 357 plainly imputes knowledge of that conveyance to

"subsequent purchasers, mortgagees, and/or judgment creditors."
21 P.S. § 357.

We can exclude by section 357's plain language the possibility that the Haners qualified as mortgagees or judgment creditors. It would be in derogation of those terms' clear meanings to add to their scope those who enter into an oil and gas lease, whether construed as conveying a fee simple determinable or another estate. That leaves only the question whether oil and gas lessees such as the Haners are purchasers for purposes of section 357. Under the circumstances, we find that they are.

We have already established, *supra*, that Pennsylvania law recognizes oil and gas leases as something other than conventional leases. A conventional lessor by definition does not convey to a lessee "rights or privileges of a permanent nature." **See** Black's Law Dictionary 898 (Deluxe 7th ed.) ("The lease term can be for life, for a fixed period, or for a period terminable at will.").[9] However, an oil and gas lease, upon vestiture arising from successful discovery and production of oil, conveys a potentially indefinite fee simple determinable.

This Court's recent decision in **Nolt**, while distinguishable, reinforces this reading of sections 356 and 357. In that case, we considered, *inter alia*,

_____

[9] An indefinite oil and gas lease is not terminable at will. Rather, upon the production of oil or gas, it terminates only when the possibility of reverter vests upon the cessation of such production.

whether a party who entered into an oil and gas lease exercised reasonable diligence in apprising himself of the status of the title. Noting the status of an oil and gas lease as a fee simple determinable, we applied the common-law obligation of due diligence associated with a "purchaser" of land to the facts at bar. First, we noted that "it is always the duty of a purchaser of real estate to investigate the title of his vendor, and the purchaser must exercise due diligence in this regard." **Nolt**, 2014 PA Super 141, at *4 (internal modifications and quotation marks omitted) (quoting **Ohio River Junction R. Co. v. Penna. Co.**, 72 A. 271, 273 (Pa. 1909)). After reviewing our Supreme Court's discussion of the obligations associated with due diligence in **Lund v. Heinrich**, **see** 189 A.2d 581, 585 (Pa. 1963), we explained as follows:

> [A] purchaser fulfills his or her due diligence requirement when he or she examines the documents recorded in the county or counties in which the property is situated and when he or she asks the possessor about title, as well as any other people the purchaser has reason to believe would know about the status of the property's title.

**Nolt**, 2014 PA Super 141, at *4. In **Nolt**, we found that the "landman" for the lessee in question had exercised due diligence: She undisputedly had checked the title records in the county in which the land was situate and had contacted the resident of a house on the property in question. Although we relied upon a common-law due diligence requirement in resolving that case, we noted in tandem with our discussion of the governing principles that

- 37 -

21 P.S. § 357 confers constructive notice upon subsequent purchasers of the property recorded. *Nolt*, 2014 PA Super 141, at *4 n.5.

We are constrained to find that the same obligation of due diligence, and the same consequence of section 357, inheres in the instant matter. The Haners purchased the oil and gas lease here at issue from their predecessor in title. In so doing, they obtained an estate in land, a fee simple determinable in the OGMs[10] that was qualified only by the lessor's reversionary interest in the event that the lessee ceased production on the land. As purchasers of a fee, by section 357's plain language, they necessarily were subject to the constructive notice imputed to them by statute as though they "had actually joined in the execution of the agreement or agreements aforesaid," 21 P.S. § 357, *i.e.*, Sabella's acquisition of the subject OGMs. In declining to conduct a full title search, when such would have revealed conclusively Sabella's ownership of the OGMs, the Haners lost their claim to *bona fide* purchaser status and their recourse to the protections associated with that status. Consequently, the trial court erred in ruling that the Haners acted in good faith in their oil and gas operations at any time during their drilling operations. Because the Haners were not good-faith purchasers of the OGMs, they were entitled to

_____

[10] Because there were already productive wells on the land when the Haners purchased the lease, their interest in the land was never inchoate. In effect, they purchased an already-vested fee simple determinable in the OGMs.

no offsets whatsoever; rather, Sabella was entitled to recover the entirety of the revenues the Haners derived from their production upon Sabella's OGMs.

Having so ruled, we find the balance of the Haners' issues associated with good and bad faith status to be moot. The Haners' challenges to the trial court's calculations of the appropriate offsets also are moot, as are Sabella's corollary challenges to said calculations and the adequacy of the evidence introduced by the Haners as to this matter.

## B.    Pre-Judgment Interest and Delay Damages

Only one issue remains for our consideration. Sabella contends that the trial court erred in denying him pre-judgment interest or delay damages in this matter. Sabella relies principally upon our Supreme Court's decision in **Marrazzo v. Scranton Nehi Bottling Co.**, in which the Court opined as follows:

> Although there is language in some early cases to the contrary, **City of Allegheny v. Campbell**, 107 Pa. 530 (1884); **Penna. R.R. Co. v. Patterson**, 73 Pa. 491, 498-499 (1873), it is now the settled law in this Commonwealth that interest, as such, is not allowed in tort actions when the damages sought to be recovered are unliquidated. **Girard Trust Corn Exch. Bank v. Brink's Inc.**, 220 A.2d 827 (Pa. 1966); **Carbondale City Sch. Dist. v. Fidelity & Deposit Co. of Md.**, 31 A.2d 279 (Pa. 1943); **Klages v. Phila. & Reading Terminal Co.**, 28 A. 862 (Pa. 1894); Act of April 6, 1859, P.L. 381, § 1, 12 P.S. § 781 and 1 Sm.L. 7, § 2, 12 P.S. § 782.
>
> This Court, however, has developed the doctrine that:
>
> > '* * * there are cases sounding in tort, and cases of unliquidated damages, where not only the principle on which the recovery is to be had is compensation, but where, also, the compensation can be measured by market value or other definite standard. Such are cases of the

> unintentional conversion or destruction of property, etc. Into these cases the element of time may enter as an important factor, and the plaintiff will not be fully compensated unless he receive not only the value of his property, but receive it, as nearly as may be, as of the date of his loss. Hence it is that the jury may allow additional damages in the nature of interest for the lapse of time. It is never interest as such, nor as a matter of right, but compensation for the delay, of which the rate of interest affords the fair legal measure.' ***Richards v. Citizens Natural Gas Co.***, 18 A. 600 (Pa. 1889).
>
> ***Irvine v. Smith***, 53 A. 510 (Pa. 1902); ***Stevenson v. Ebervale Coal Co.***, 52 A. 201 (Pa. 1902); ***Klages***, *supra*; ***Campbell v. Baltimore & Ohio R.R. Co.***, 58 Pa. Super. 241 (1914). We have emphasized that compensation for delay in payment is not a matter of right but is an issue for the finder of fact, the resolution of which depends upon all the circumstances of the case.

263 A.2d 336, 337 (Pa. 1970). Outside the context of contract actions, where damages arising from breach of contract may be awardable as of right, we review a trial court's decision regarding pre-judgment interest for an abuse of discretion. ***Liss & Marion, P.C., v. Recordex Acquisition Corp.***, 937 A.2d 503, 516 (Pa. Super. 2007) (citing, *inter alia*, ***Kaiser v. Old Republic Ins. Co.***, 741 A.2d 748, 755 (Pa. Super. 1999)).

Sabella maintains, in effect, that, because the damages awardable in this matter were liquidated inasmuch as they might be calculated based upon various objective criteria for the periods of time in question, ***Marrazzo*** left the trial court no choice but to award pre-judgment interest. In the alternative, Sabella argues that he is entitled to delay damages as a matter of equity – again, because the damages in question are susceptible to calculation pursuant to objective consideration preceding the entry of

- 40 -

judgment. Sabella's argument is brief, underdeveloped, and does not acknowledge **Marrazzo**'s specific observation that the decision whether to award pre-judgment interest lies with the fact-finder.

In this case, the trial court, sitting as fact-finder, was vested with discretion to determine whether and to what extent pre-judgment interest or delay damages were due in this matter, a determination we will not overturn absent a showing that such discretion was abused. The trial court acknowledged that the damages in this case might have been ascertainable, but emphasized correctly that "that fact alone is not dispositive of an award of prejudgment interest." T.C.O., 1/25/2013, at 33. The trial court further explained its decision not to award pre-judgment or delay damages as follows:

> Each party to this case made a legal argument as to the amount of damages that should be awarded. [The Haners] did not have a clear legal obligation to pay [Sabella] any damages. Neither party was necessarily at fault for the delay in payment. Thus, [the Haners] are not faulted for failing to pay [Sabella] during the pendency of this litigation.
>
> In the alternative, [Sabella] requests this [c]ourt to use its equity powers to award delay damages. For the reasons mentioned above, the interests of justice would not be served were this [c]ourt to award delay damages to [Sabella].

**Id.** at 33-34.

If we were to uphold the trial court's measure of damages and the legal basis underlying it in all their particulars, Sabella's failure to establish any basis upon which we might conclude that the trial court abused its

discretion would preclude relief on this claim. However, the trial court's ruling on this matter expressly hinged upon its finding that the Haners "did not have a clear legal obligation to pay [Sabella] any damages." Inasmuch as the trial court ultimately entered judgment in favor of Sabella, we read this comment as suggesting that, to the trial court, the question of Sabella's entitlement to damages remained unsettled during the course of this litigation. Accordingly, it would be inappropriately punitive to impose such interest or damages upon the Haners.

We believe that this premise at least arguably is undermined by our determination that the Haners acted at all relevant times in bad faith in its production of oil and gas from Sabella's estate. Although we would not intrude upon the trial court's prerogative to determine whether the circumstances of this case, even as modified by our ruling in this matter, warrant an award of pre-judgment interest, we conclude that the trial court should reconsider this decision in light of our ruling that the Haners were trespassers in bad faith at all times relevant to this litigation. Consequently, we vacate the trial court's order to the extent that it denied Sabella's request for pre-judgment interest or delay damages, but we express no opinion as to whether the trial court should award such interest or damages as a consequence of our rulings in this matter. Such interest and damages do not appear to us to be compelled by law. We merely invite the trial court to re-examine its decision anew upon remand.

## CONCLUSION

For the foregoing reasons, we find that the trial court had subject matter jurisdiction over the instant matter. No indispensable party was absent from this litigation so as to deprive the trial court of its jurisdiction to hear and decide the claims raised in this case. We further find that the trial court did not err or abuse its discretion in applying the discovery rule to find that Sabella's claims were brought before the expiration of the applicable statutes of limitation. The Haners' challenge to the trial court's grant of partial summary judgment to Sabella also is unavailing. The Haners having failed constructively to assert the basis at trial upon which they now seek relief, it would be unfair and in violation of binding law for us to grant such relief. Consequently, we affirm those aspects of the trial court's rulings.

However, we conclude that the trial court erred in finding that the Haners' trespass from the commencement of its production of Sabella's OGMs to March 2008 was enacted in good faith. Because this ruling precludes the application of any offsets for the cost of production against the damages to which Sabella is entitled, we must vacate the trial court's judgment and remand for the recalculation of compensatory damages freed from any offset for the costs of development and production. In so doing, we also vacate the trial court's order denying Sabella pre-judgment interest and/or delay damages, in what amounts solely to an invitation to the trial court to reconsider (without any limitation upon its discretion) its ruling on such interest and/or damages in light of our determination that the Haners acted at all times as bad-faith trespassers.

Judgment affirmed in part and vacated in part. Case remanded. Jurisdiction relinquished.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/20/2014