J-A03023-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| RACHEL CARSON TRAILS CONSERVANCY, INC. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| RONALD EICHNER | : | |
| | : | |
| Appellant | : | No. 1347 WDA 2022 |

Appeal from the Order Entered November 10, 2022
In the Court of Common Pleas of Allegheny County Civil Division at
No(s):  GD-20-008369

BEFORE:  BOWES, J., KUNSELMAN, J., and MURRAY, J.

MEMORANDUM BY KUNSELMAN, J.:                **FILED: February 9, 2024**

## I.      Introduction

In the early 1900s, when electric trolleys were a common form of mass transit, the "Harmony Route," ran north from Pittsburgh, through the Wexford area, to Lawrence and Butler Counties.[1]  That route closed in 1931, and the Rachel Carson Trails Conservancy, Inc. ("RCTC") hopes to convert sections of it into a public hiking trail.  As part of that effort, in 2020, RCTC filed this lawsuit to enjoin Ronald Eichner from interfering with its use and improvement of 606 yards of "Harmony Trail."  The court of equity ruled in favor of RCTC.

Mr. Eichner appeals from the order and equitable decree that (1) permanently enjoined him from interfering with RCTC's use thereof and (2) denied his counterclaim seeking to extinguish RCTC's easement.  We affirm.

---

[1] **See** The Pennsylvania Trolley Museum, "Pittsburgh Harmony Butler & New Castle Railway 115," available at https://pa-trolley.org/collection/pittsburgh-harmony-butler-new-castle-railway-115/ (last visited 1/22/24).

## II. Factual and Procedural Background

On December 28, 1996, Precision Equities, Inc. deeded the 606-yard easement to RCTC.[2] Precision conveyed "the free and uninterrupted use, liberty and privilege of easement and right of way for the purpose of ingress, egress and regress in and upon" Precision's property. RCTC's Ex. K at 1. The easement followed the old Harmony Route from the southern line of Precision's property (in McCandless Township) to its northern line (in Pine Township). *See id.* at 1-2; *see also* RCTC's Ex. J (showing the easement as a red line on a 2010 satellite image from the Allegheny County Department of Real Estate's website).

The deed plainly expressed the intention of Precision and RCTC to "form a continuous through trail traversing [Precision's] land as nearly along the natural contours of said land in a width not to exceed" 25 feet. *Id.* at 2. It also granted RCTC the right to access "adjacent areas for parking and access to and from said Trail Area as shall be necessary to complete said Trail Area." *Id.*

On February 7, 1997, RCTC recorded its easement. *See id.* at 3.

Four months later, in June 1997, Precision sold its property to Mr. Eichner. However, Precision neglected to inform him that it had previously

---

[2] Technically, the easement is 1,818.49 feet in length. Also, in 1996, RCTC was known as Harmony Trails Council Corp., which is the named grantee in the deed. Harmony Trails Council rebranded as RCTC upon acquiring the much-longer Rachel Carson Trail in 2004.

granted RCTC an easement through that land, and Mr. Eichner's title searchers did not uncover or report the easement.

Mr. Eichner's newly purchased property abutted his farm. Therefore, he knew of "people driving on the property and dumping things off, especially after Penn Power[3] modified their substation . . . and made the entrance looking to go up on the property." N.T., 12/30/21, at 97. He removed "a refrigerator, two stoves, rolled up hardware, six or seven stacks of branches or leaves, [and other] things that shouldn't be on private party." *Id.* at 97-98. Due to this history of unlawful dumping, on June 27, 1997, shortly after he closed on the property, Mr. Eichner "constructed two sections of split-rail fence, two posts and a chain, both north and south of [his new] property." *Id.* at 97. He also posted no-trespassing signs. *See* Eichner's Exs. 10 & 11. One sign threatened prosecution if there was "trespassing for any purpose . . . ." Eichner's Ex. 10 (capitalization removed).

However, Mr. Eichner did not initially intend to exclude trail users from his newly purchased land, because, at that time, he was unaware of RCTC's trail easement. N.T., 12/30/21, at 98. In fact, RCTC had not yet acquired access along the Harmony Route to the easement in 1997. As such, RCTC was unable to make immediate improvements on the trail, because it needed

---

[3] Penn Power owns parcels at both ends of Harmony Trail and has a powerline easement running through the same valley. The electric company allows trail users to park their cars in its parking lot at the northern end of Harmony Trail, *i.e.*, on the south side of State Route 910. *See* N.T., 10/19/21, at 60-61. Penn Power is not a party to this action. Gas and sewer-line easements also traverse the valley with the Harmony Trail. *See* N.T., 12/30/21, at 83.

more land or easements leading south from State Route 910 (a.k.a., Wexford Bayne Rd.) to its easement on Mr. Eichner's property. *See* N.T., 10/19/21, at 63. By 2000, RCTC acquired the adjoining land and other easements down the old trolley route to reach Mr. Eichner's property. *See id.* at 64. Thus, only three years after Mr. Eichner purchased the property, the public could walk, bike, and ski from State Route 910 southward on the Harmony Trail, through the easement on Mr. Eichner's property, and then turn around and head back to State Route 910.

For example, John Stephen, a trail developer for RCTC since 2001, was one of many volunteers who developed and maintained the Harmony Trail. *See* N.T., 10/19/21, at 44. He walked the easement on Mr. Eichner's property about "once a year, ten times maybe." *Id.* at 58. Whenever he reached the easement on Mr. Eichner's land, if the chain was up, it did not physically bar his passage south. Mr. Stephen was always "able to step over it [or] around it." *Id.* He explained, "the chain crosse[d] the railroad . . . so going around it mean[t] going into the grass, but you [could] do that." *Id.* at 59.

Michael Taylor, a member of the Harmony Trail Committee and a trail steward, performed maintenance on the trail and removed fallen trees when needed. *See* N.T., 12/30/21, at 9. He moved into a development near the Harmony Trail and "really started using it a lot in the summer, fall of 2016." *Id.* at 10. Thus, 19 years after Mr. Eichner erected the fences and chain, Mr. Taylor began to "use the trail for walking, hiking, and biking" sometimes daily. *Id.* at 9-10.

Whenever he reached Mr. Eichner's property, the presence of the chain varied. *See id.* at 10. If it was up, Mr. Taylor would "just turned around" and headed back to State Route 910. *Id.* at 13. If the chain was down, Mr. Taylor would continue onto the easement and "intermittently" hiked there. *Id.* at 10. He found the chain down "on more than one occasion." *Id.* at 19. Furthermore, Mr. Taylor confirmed that it was "possible to step over the chain" and that "*lots of people* in the neighborhood would" go south of the chain, including "folks with a baby stroller . . . ." *Id.* at 11 (emphasis added).

Another member of the Harmony Trail Committee and trail steward, Eoin Gormmey, used the Harmony Trail for cycling, walking, and cross-country skiing. *See id.* at 45. He did these activities in the easement on Mr. Eichner's property, even though he "frequently" found the chain draped across the easement. *Id.* While Mr. Gormmey could step over the chain, like Mr. Taylor, he viewed the chain being up as meaning that RCTC's easement was closed. However, when the chain was down, he "took it [to mean] that the trail was opened; the easement was accessible." *Id.* at 46. At those times, Mr. Gormmey "cycled . . . south following [RCTC's] easement across Mr. Eichner's property." *Id.* at 53.

Similarly, RCTC's Treasurer and one of its founders, Charles Berthauer, hiked the Harmony Trail about six times a year. Those hikes included the easement on Mr. Eichner's property. Half of the time, the chain hung across the easement, but, if Mr. Berthauer "wanted to go down the easement portion, [he] just stepped over it." *Id.* at 60. While there, he saw "as many people

on the easement portion of the trail" as he saw on its other sections. ***Id.*** at 72.

Mr. Berthauer also explained that, in 2008, RCTC hired a contractor to install water-management culverts on the trail. ***See id.*** at 73. According to Mr. Brethauer, the contractor installed some of the culverts on Mr. Eichner's property in RCTC's easement. The culverts were pipes "either eight or ten inches in diameter, up to a foot, foot-and-a-half, to allow water to flow into the trail from the [hill]side to the low side." ***Id.*** at 74. Mr. Eichner never asked RCTC to remove the culverts; they remain on his land. ***See id.***

Finally, Robert Mulshine, another founder of RCTC, started walking the Harmony Trail in 2007, and he too has "been on the easement." ***Id.*** at 76. He saw the chain "lying on the ground," and, in his view, "it was never intended to get people off the trial." ***Id.*** "There was no fence across the trail," and, if the chain was up, people "would step over it." ***Id.*** at 76-77.

In particular, on November 6, 2010, Mr. Mulshine and the other board members of RCTC "did a walk in the ball park to Bradford Woods Elementary School, along the route of the old Harmony trolley line." ***Id.*** at 78-79. In doing so, they "walked the entire length, which means [they] walked all [606 yards] of the easement." ***Id.*** at 79.

When Mr. Eichner's counsel asked Mr. Mulshine if he ever saw the lock on the chain, Mr. Mulshine explained that the lock never barred ingress to or use of RCTC's easement. He said, "the lock forms a loop in that chain, and [there is] a pole that it's sitting on." ***Id.*** at 84. "[Y]ou lift that loop up and

put the chain down on the ground, so you get vehicles down there to do maintenance on the easement. That lock is **not** preventing access." **Id.** (emphasis added).

Indeed, upon questioning from his own counsel, Mr. Eichner admitted that his fences, chains, and no-trespassing signs failed to prevent the public and RCTC members from using the easement. According to Mr. Eichner, people would simply "pull out one of the metal posts that the chain is locked to and just lay it on the ground, or on . . . the northern end, they would kick the split-rail fence down." **Id.** at 99. He continually repaired or replaced the fences and chains when he found them displaced or damaged, but people continually destroyed, removed, or ignored them.

In 2020, RCTC hired another contractor to improve the easement on Mr. Eichner's property by using an excavator to lay a limestone base along that portion of the Harmony Trail. When Mr. Eichner learned there was a contactor working on the easement, he called the police. They said this was civil matter for the courts. The contractor and RCTC board members left the easement after improving only a fraction of the easement.

A few months later, in August 2020, RCTC sued to enjoin Mr. Eichner from interfering with its (and, by extension, the public's) use of the Harmony Trail. Mr. Eichner filed a counterclaim for quiet title, asking the court of equity to declare RCTC's 606-yard easement extinguished by Mr. Eichner's alleged adverse possession of it.

Additionally, on September 20, 2021, RCTC moved for a preliminary injunction. The common pleas court assigned the motion to Judge Arnold Klein. Sitting in equity, the court conducted two days of hearings, on October 19, 2021 and December 30, 2021, respectively. Six months later, the parties filed post-hearing briefs. The court eventually issued a Memorandum and equitable decree granting RCTC a **permanent** injunction and denying Mr. Eichner's counterclaim for quiet title by adverse possession. **See** Trial Court Order, 9/12/22.

A week later, Mr. Eichner moved for reconsideration, which the equity court granted on October 7, 2022. Another hearing occurred on October 19, 2022 to determine whether RCTC was entitled to a permanent injunction. At that hearing, Mr. Eichner and Mr. Mulshine both testified, and more documents were admitted into evidence.

On November 10, 2022, the equity court entered an order denying Mr. Eichner's claim for adverse possession of the easement. The court further decreed that Mr. Eichner "shall remove any chains and/or other barriers interfering with [RCTC's] use of its easement that is the subject of this suit." Trial Court Order, 11/10/22, at 1. The court also "permanently enjoined [him] from interfering with [RCTC's] property rights in the easement at issue in this case." **Id.** This timely interlocutory appeal, as of right, followed.[4]

_____

[4] Under Pa.R.A.P. 311(a)(4)(ii), an "an order is immediately appealable when it enjoins conduct previously permitted and is effective before entry of the

*(Footnote Continued Next Page)*

## III. Analysis

Mr. Eichner raises the following three appellate issues:

1.   Whether the [equity] court committed mistakes of fact resulting in a decision contrary to the law?

2.   Whether [Mr.] Eichner proved all of the elements of adverse possession when it is undisputed that he posted no trespassing signs; a chain fence with locks on June 27, 1997; and that they have continued until the order of court dated November 10, 2022?

3.   Whether the court of [equity] resolved issues not before it?

Eichner's Brief at 5.  We address each issue in turn.

A.   Issues of Fact

First, Mr. Eichner contends the court of equity made erroneous factual findings.  He identifies those findings of facts and citations to the record in the equity court's Memorandum with which he disagrees, but he fails to establish how those factual errors entitle him to appellate relief.  Critically, his argument contains no case law or other authority.[5]  **See id.** at 32-34.  Mr. Eichner declares, without any legal support, that "When there are material mistakes of fact, the ruling must be overturned whereas [*sic*] the mistakes of fact are

_____

final order."  **Morgan v. Millstone Res. Ltd.**, 267 A.3d 1235, 1243 (2021) (quotations omitted).  Thus, the fact that Mr. Eichner neither filed post-trial motions nor praeciped for the entry of a final judgment does not deprive this Court of appellate jurisdiction over the November 10, 2022 order or result in waiver based on Pa.R.C.P. 227.1.  **See id.**

[5] We also note that Mr. Eichner cited no legal authority in the section of his brief regarding our Scope and Standard of Review to support his erroneous contention that, because "this case has mixed issues of fact and law, the standard is plenary."  Mr. Eichner's Brief at 3.

complete fabrications and total distortions of the facts, it certainly needs to be overturned." *Id.* at 35.

He then speculates that "both of the Memorandum and Opinions were written by law clerks who did not have access to the Transcript of October 19, 2021 and certainly not the Transcript of October 19, 2022 which was only transcribed on December 21, 2022." *Id.* Mr. Eichner again offers no legal authority as to why, even if we assumed that a law clerk drafted the court of equity's Memorandum without access to the transcripts, this would necessitate reversal of the appealed-from order.

Our Rules of Appellate Procedure require appellants to develop cogent, legal arguments – as opposed to factual ones – in their briefs to this Court. Indeed, an appellant's "argument . . . shall have . . . such discussion **and citation of authorities** as are deemed pertinent." Pa.R.A.P. 2119(a). When "defects in a brief prevent meaningful review, the issue may be found waived."[6] **Sephakis v. Pennsylvania State Police Bureau of Recs. & Identification**, 214 A.3d 680, 687 (Pa. Super. 2019).

Mr. Eichner would have us substitute his view of the evidence for that of the equity court to reverse the permanent injunction. However, he cites no law to demonstrate that such relief is warranted, even if we ultimately agreed

---

[6] "The applicability of waiver principles presents a question of law, over which our standard of review is *de novo* . . . [and] our scope of review is plenary." **Temple Est. of Temple v. Providence Care Ctr., LLC**, 233 A.3d 750, 760 (Pa. 2020).

with him that the equity court made certain factual misstatements and incorrect citations to the record in its Memorandum. Moreover, he does not consider (much less provide an argument pertaining to) our deferential standard of review for the factual findings of the equity court.[7] Given the deficiencies of Mr. Eichner's appellate argument, we dismiss his first issue as waived.

B. Issues of Law

For his second appellate issue, Mr. Eichner asserts that he proved his counterclaim of adverse possession to extinguish RCTC's easement. He begins by stating, "Since the [equity court's] law clerk was not present at any of the hearings, and particularly the hearing of October 19, 2022, and the transcript had not been transcribed, [the law clerk] would not know that Mr. Mulshine had stated that there was no evidence to contradict that the signs were erected on June 27, 1997." Mr. Eichner's Brief at 36. He then declares that RCTC's witnesses "prove that they knew in 1997 Mr. Eichner was claiming the property." **Id.** He ultimately tries to relitigate the facts, as he sees them, relying upon his own self-serving testimony. **See id.** at 36-37.

The remainder of Mr. Eichner's argument is as follows:

> This Court ignored all of the relevant cases cited by counsel for Mr. Eichner, including **Schlagel v. Lombardi**, 486 A.2d 491 (Pa. Super. 1984) citing **Malachos v. Witherow**, 118 A.2d 1955

---

[7] A court of equity's "findings of fact will not be disturbed absent an abuse of discretion, a capricious disbelief of the evidence, or a lack of evidentiary support on the record for the findings." **Carroll v. Ringgold Education Ass'n**, 680 A.2d 1137, 1140 (Pa. 1996).

and ***Jones v. Porter***. More importantly, the cases state actual possession of land is dominion over the land. It is not the equivalency to obvious. ***Reed***, ***supra***. ***Brennan v. Manchester Crossinqs, Inc.***, ***supra***. ***Closs v. Melenday***, 513 A.2d 490 (Pa. Super. 1986). Also, the case of ***Homeland Company v. Neiqh and Reed v. Walnick*** which stated ownership is not destroyed because other persons occasionally pass unobserved over the lot in question. ***See Stern v. Fried***, 570 A.2d 1079 (Pa. Super. 1990) which states visible and notorious possession ownership must be evidenced by conduct sufficient to place a reasonable person on notice that his/her land is being held by the claimant as his own. Also, the case of ***Zegland v. Gahaghen***, 812 A.2d 558 (Pa. 2002) states that "the law mandates that a person asserting a claim of adverse possession make that assertion openly and notoriously to all the world. There must be no secret that the adverse possessor is asserting a claim to the land in question."

Now, most importantly, I requested that the law clerk review the last cases I cited in my Post-Hearing Brief, ***Brennan v. Manchester Crossings, Inc.***, 708 A.2d 215, ***Weibel v. Wells***, 156 A.3d .1220, *appeal denied* at 130 A.3d 31. These most recent cases show the duty of [RCTC] by stating, "To interrupt continuous adverse use of property and toll running of the statute of limitations on an adverse possession claim, the owner must ***(1) bring and pursue to judgment legal proceedings in which the use is determined to be without legal justification; or (2) cause the cessation of the use without the aid of legal proceedings.***" It is clearly obvious that [RCTC] in this case did not do that. The court in this case did not follow the law, either on adverse possession or the duty of the person who wants to challenge adverse possession. Also, the time frame in this case is very questionable. Mr. Eichner put up his signs and chains on June 27, 1997. On June 12, 2020, almost two (2) years [after he] had acquired the property by adverse possession, officials and contractors were on the property to start construction of the trail. It is noteworthy that [RCTC's] people left the scene on June 12, 2020 and filed a lawsuit on August 6, 2020. Now more than 22 months after filing suit and two years after they left the scene when the police arrived, they are alleging severe and irreparable harm for a preliminary injunction.

Restatement of Property § 7.7

Mr. Eichner's Brief at 37-39 (emphasis in original).

The above two paragraphs are the only portion of Mr. Eichner's 50-page brief that contain any legal authority. However, because Mr. Eichner's counsel copied his Motion to Reconsider to serve as the above section of his appellate brief, the two paragraphs do not address the issue that Mr. Eichner raised on appeal. **See** Motion to Reconsider at 12-13.

In fact, the only change Mr. Eichner made in this section of his appellate brief from his Motion to Reconsider was to add the phrase "Restatement of Property § 7.7" at the end of the argument. **Id.** at 39. He does not even indicate **which** RESTATEMENT he means. Nonetheless, we recognize that Mr. Eichner included one page from the RESTATEMENT (THIRD) OF PROPERTY in the back of his Reproduced Record.[8]

From this, we infer Mr. Eichner would have us rely upon Section 7.7 of the RESTATEMENT (THIRD) OF PROPERTY, but he makes no argument concerning that treatise. Mr. Eichner does not claim that any court of this Commonwealth has adopted **any** section from the RESTATEMENT (THIRD), much less Section 7.7. Nor does he explain why we should rely upon it as an accurate reflection of Pennsylvania property law. Thus, the phrase "Restatement of Property § 7.7" that Mr. Eichner appended to his Motion to Reconsider does not constitute a meaningful appellate argument, so much as an incomprehensible mic-drop. We decline to consider Section 7.7 of the new RESTATEMENT and its place – if

_____

[8] Neither party made the RESTATEMENT (THIRD) OF PROPERTY a part of the certified record. Thus, it should not be in Mr. Eichner's Reproduced Record. **See** Pa.R.A.P. 2152(a).

- 13 -

any – in Pennsylvania law without supporting justification from the party who seemingly would have us apply it.

Moreover, the issue Mr. Eichner raised in this Court was whether **he** proved his counterclaim of adverse possession. The two paragraphs from his Motion to Reconsider instead focus upon what he viewed as the insufficiencies of **RCTC's** proof to obtain a preliminary injunction. His last sentence makes this clear: "Now, more than 22 months after filing suit and two years after [RCTC] left the scene when the police arrived, they are alleging severe and irreparable harm for a preliminary injunction." Motion to Reconsider at 13; Eichner's Brief at 38-39. In other words, Mr. Eichner's argument discusses what he believes RCTC needed to do to **disprove** his counterclaim for adverse possession, a burden that RCTC has no obligation to bear.

Mr. Eichner's counterclaim for quiet title, based on a claim for adverse possession, was an affirmative defense under the 21-year statute of limitations for bringing an ejectment, trespass, or other action against him for interfering with RCTC's interest in and use of the easement. "A defendant asserting an affirmative defense has the burden of proof as to that affirmative defense." **Sabella v. Appalachian Dev. Corp.**, 103 A.3d 83, 93 (Pa. Super. 2014). "As the party asserting the affirmative defense of the statute of limitations, [Mr. Eichner] bore the initial burden of establishing that the action was filed after the applicable period would have expired, had it started to run at the time the cause of action accrued." **Id.** Indeed, "the burden of proving

adverse possession falls on the one asserting title under it . . . ." ***Conneaut Lake Park v. Klingensmith***, 66 A.2d 828, 829 (Pa. 1949).

Thus, to succeed on the issue that he raises on appeal, Mr. Eichner may not rely on the alleged deficiencies in RCTC's rebuttal of his counterclaim for adverse possession. By doing so, Mr. Eichner erroneously attempted to shift his burden of proof to RCTC. Instead, to succeed on appeal, he needs to establish that, even viewing all the facts in the light most favorable to RCTC as the winner below, Mr. Eichner "is entitled to judgment as a matter of law [or] the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant." ***Harley v. HealthSpark Found.***, 265 A.3d 674, 684 (Pa. Super. 2021).

Noticeably absent from Mr. Eichner's brief are the elements for adverse possession to extinguish an easement. Thus, he offers no explanation as to how he so clearly proved each of those elements that "the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in [his] favor . . . ." ***Id.***

Because members of RCTC and the public repeatedly used the easement since the early 2000s, despite Mr. Eichner's efforts to keep them off his property, Mr. Eichner fails to make a colorable claim for judgment, as a matter of law. Clearly, Mr. Eichner admitted his chain and fencing were ***ineffective*** in preventing RCTC members and the public from using the easement. He conceded people repeatedly removed or destroyed his barriers. ***See*** N.T., 12/30/21, at 99. Thus, his no-trespassing signs were insufficient to extinguish

the easement, because the signs did not give him continuous, exclusive possession of the easement.

As owner of the property in fee simple, Mr. Eichner obviously believes the trail goers have trespassed against him. They did not. "It is well-settled law that in order to establish a claim for trespass, a plaintiff must prove an intentional entrance upon land in the possession of another ***without a privilege to do so***." ***Kennedy v. Consol Energy Inc.***, 116 A.3d 626, 636 (Pa. Super. 2015) (emphasis added). Here, RCTC has a deed that privileges its members and other trail goers to enter and use the 25-foot-wide by 606-yard-long easement. Therefore, RCTC members and the public were ***not*** trespassers when they entered Mr. Eichner's property, because the easement privileged them to do so.

Instead, ***Mr. Eichner*** trespassed against them and their property rights of access and use. "It is beyond cavil in Pennsylvania that a property owner may use his property ***only*** in ways that ***do not*** interfere with the rights of the easement holder." ***Starling v. Lake Meade Prop. Owners Ass'n, Inc.***, 162 A.3d 327, 343 (Pa. 2017). "The owner of the servient tenement [*i.e.*, Mr. Eichner] may make any use thereof which is consistent with or not calculated to interfere with the exercise of the easement." ***Minard Run Oil Co. v. Pennzoil Co.***, 419 Pa. 334, 214 A.2d 234, 235 (1965). By blocking the easement and intentionally inferring with RCTC's attempts to improve the trail, Mr. Eichner committed repeated trespasses against the rights of RCTC, as expressed in RCTC's deed from Precision. ***See*** RCTC's Ex. K at 1, 3.

RCTC and the public, in turn, had the common-law remedy of self-help at their disposal to negate Mr. Eichner's repeated trespasses and, thereby, maintain their access to and use of the easement. Regarding that ancient remedy, this Court has said, "act[s] of commission are committed in defiance of those whom such [wrongful acts] injure, and the injured party may abate them without notice to the party who committed them . . . ." ***Jones v. Wagner***, 624 A.2d 166, 168 (Pa. Super. 1993) (holding that the remedy of self-help is available to the landowners whose neighbors' trees grow across the property line) (quoting ***Gostina v. Ryland***, 199 P. 298, 299–300 (Wash. 1921)).

We hold that an easement owner, the owner's agents, or the owner's invitees may exercise the remedy of self-help when the possessor of a servient tenement obstructs the dominant estate's easement, because the owner of the dominant estate may enter the servient estate to do anything reasonably necessary to ensure the proper use and enjoyment of the easement. ***See*** 3 Tiffany, REAL PROPERTY at 346-51, § 810 (3d ed. 1939). By ignoring Mr. Eichner's no-trespassing signs, stepping over the chain, or laying it on the ground, the members of RCTC and the public were exercising reasonable self-help to remedy Mr. Eichner's violations of RCTC's easement rights.

In sum, Mr. Eichner has neither contended nor established that he is entitled to judgment, as a matter of law, on his counterclaim for quiet title by adverse possession.

His second appellate issue affords him no relief.

C.      Issues of Procedure

Finally, Mr. Eichner contends the court of equity resolved legal issues that were not before it.  He claims the court could not grant the permanent injunction, because RCTC did not explicitly petition it for one.  **See** Eichner's Brief at 39.  He also believes the equity court had no authority to dismiss his counterclaim for quiet title by adverse possession, even though it was his affirmative defense to RCTC's Complaint.

Like his first appellate issue, Mr. Eichner cites no legal authority or any rule of procedure to support his claims of procedural error.  **See id.** at 39-40. Thus, he has waived his final appellate issue.  **See** Pa.R.A.P. 2119(a); **see also Sephakis**, **supra**.

Order affirmed.


Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 02/09/2024